ADAMS *v.* TURNBULL, ET AL.

[No. 143, September Term, 1958.]

*Decided January 21, 1959.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Edward L. Rich, Jr.,* and *Eben F. Perkins,* with whom were *Perkins & Rich* on the brief, for appellant.

*Kenneth C. Proctor,* with whom were *Proctor, Royston & Mueller* on the brief, and *R. Taylor McLean,* with whom were *White, Page & Lentz* on the brief, for appellees.

HAMMOND, J., delivered the opinion of the Court.

At his mother's death when he was seventeen, J. Fred Adams, Jr. (commonly called Tubby), inherited in trust a small fortune from his maternal grandfather which became his outright in 1925, when he attained his majority. His father died in 1955, leaving Tubby a life estate in the rest and residue of his estate, which consisted of his home place in Baltimore County, Glen Wild, and the proceeds of recently sold acreage, all worth some $600,000. After he had instituted and abandoned a caveat against the will, Tubby sued in equity to enforce specifically a claimed contractual undertaking by his father, said to have been entered into in 1925, to will him outright everything the father owned at his death. The consideration for the promise was alleged to have been the transfer of the son's inheritance to the father to be used, income and principal, to support and maintain both of them in the style to which they had been accustomed. The chancellor found the evidence as to the contract relied on "uncertain and unconvincing" and dismissed the bill. Tubby appealed.

In 1902 Dr. J. Fred Adams married Miss Nellie Appold, who enjoyed for life a sizeable income from a trust created by her father. In 1904 their son Tubby was born. The family lived luxuriously, in winter in a town house and in summer at Glen Wild, a four hundred acre country place near Catonsville. In 1917 the doctor gave up his practice and devoted his time to farming and the raising and racing of horses. Mrs.

Adams had bought Glen Wild from the trustees of her father's trust estate and willed it to her husband subject to an unpaid balance of the purchase price. Six months after his wife's death in 1921, Dr. Adams petitioned the equity court in which the Appold trust estate was administered to allow him $600.00 a month of Tubby's income to maintain the boy in his accustomed manner—which was a life of ease and comfort. He testified then that this was his wife's dying request, that he had no income of his own, that he could break even and maintain himself from the operation of the farm, but that he could not practice medicine and support Tubby, and at the same time keep Glen Wild, and said: "And what I must do is to hold together what we have there on the farm * * * for the future benefit of us * * *. If I have to sacrifice that, it would destroy it for my boy and for myself, too."

Tubby offered evidence that some $240,000 in bearer bonds, registered bonds, stocks, mortgages and cash were delivered to him by the trustees of his grandfather's trust and that much of it was turned over to his father, including a $9,000 mortgage on Glen Wild from the doctor to the trustees, which Tubby soon cancelled. In 1927, while he was in college, Tubby married Helen Monmonier of Catonsville. The doctor heartily disapproved, was firmly convinced the girl had married Tubby for his money and was determined that neither she nor her family, including his grandson Jimmy Adams, the child of the marriage, should ever get any Adams' money or property.

The marriage broke up in three years and Jimmy's custody was given to the mother. The doctor saw very little of him until the last years of his life when they became close to one another. Tubby studied and travelled in Europe for several years and then returned and lived with his father at Glen Wild until 1940, when he remarried. He had inherited some $60,000 from his aunt that same year, which he went through in fairly quick order. Tubby did not earn more than nominal amounts from 1925 to 1940. Besides supporting Tubby and his family from 1925 to 1940 from the family pool, the doctor supplied $11,000 from the same source for the cost of the divorce and a trust fund for Jimmy. In addition, Tubby got

about $13,000 in cash from the trustees, which he did not turn over to his father.

During all this time Dr. Adams continued to farm Glen Wild and breed and race thoroughbred horses. He had several successful years and a number of bad ones. From time to time he sold off parts of Glen Wild and lived off the proceeds.

About 1940 Dr. Adams was threatened with suit on a promissory note to his sister. He deeded all his property to Tubby and confessed judgment in his favor for $50,000. The same day the deed from the doctor to Tubby was executed, a deed back from Tubby and his wife to the doctor was executed but not recorded. Several years later, after the suit had been settled, the deed back to the doctor was recorded and Tubby executed a general release in the doctor's favor.

In 1931 Dr. Adams executed a will in which he left $15,000 to one sister, $10,000 to another sister, $5,000 to a third sister, and $5,000 to Miss Grace Brenner, who had been secretary and housekeeper for his wife and himself for many years, all free of tax, and left the rest and residue in trust for Tubby until he became forty, with remainder, if Tubby died before forty, to the doctor's heirs then living (other than Jimmy Adams). In 1954 he made a new will, in which he gave Grace Brenner $50,000 and his grandson, Jimmy Adams, $50,000, and left Tubby "my residence" and thirty-five acres of land surrounding it and "all stocks, bonds and cash * * * except, however, any such * * * as is derived from the sale of real property." The executors and trustees were directed to sell all real estate and hold the proceeds in trust for Tubby for life with remainder to Jimmy. In March 1955 Dr. Adams executed his last will, the one which, with a codicil dated June 1, 1955, was probated in July 1955. They left the same $50,000 bequests to Grace Brenner and Jimmy, gave Tubby $20,000 tax free, and "my residence" and six acres of land surrounding it, and left all the rest and residue to trustees for the benefit of Tubby for life, and then for the benefit of Jimmy for life with remainder to Jimmy's children, per stirpes. Over a year after his father's death, Tubby filed a caveat to the will on the grounds of undue influence, mental

incapacity and fraud in the execution of the will. The caveat was later dismissed, and thirty-two months after his father died Tubby filed the proceedings before us.

We assume without deciding that a demurrer to the bill properly was overruled, that it was shown that Tubby turned over the bulk of his inheritance to his father and that it was all consumed for the support and benefit of Tubby and his father, most of it for the father, and that the testimony as to the alleged contract that came in properly was received as bearing on the contract relied on, because a thorough review and consideration of the record persuades us that the chancellor was not clearly wrong in his finding that the contract had not been proven.

Tubby was precluded from testifying as to the agreement by the evidence act, Code, 1957, Art. 35, Sec. 3. The other witnesses fell into two general categories. There were a number who had heard Dr. Adams over the years make the statements that everything—or Glen Wild—was Tubby's, or that everything—or Glen Wild—would be Tubby's when he, the doctor, died. Generally, it would seem, when Dr. Adams said everything was Tubby's, he did it in refusing to sell land which he did not want to sell (when he did want to sell, he did so as he pleased) ; or, in connection with a statement that he had willed Tubby everything or there was a will drawn "on it" (this, of course, was substantially true from 1931 to 1954).

In the other category are four witnesses who referred to an agreement. One was Tubby's wife. She had signed an antenuptial agreement in 1940 when she married Tubby, and says he told her then that he had turned everything over to his father "when he was married the first time" and his father hadn't returned it, but it was all right "they had an agreement between them". She did not mention any agreement in her conversations with the individual executor and trustee—the lawyer who had drawn the will—after the will was probated and she had talked on the telephone to her husband, who was in England, several times about the will. She did not mention it in her deposition taken shortly before the trial, and spoke of it for the first time at the trial as "an agreement". Her version would seem to relate not to the agreement set

up in the bill of complaint but to one anent Tubby's first marriage, which came two years later, and the doctor's desire to keep the wife's family from getting the Adams' money. A tenant at Glen Wild said that the doctor told him that when Tubby was getting a divorce he advised his son to turn over to him all his money "to keep the Monmoniers from getting it". A purchaser of a lot from the Glen Wild acreage in 1952 said the doctor told him he was merely handling the property for his son, who had given him several hundred thousand dollars to live off of and that "when he died all of this property goes to the son because there has always been a will drawn on it and it was still in effect at that time." A friend of Tubby's and his wife, for over twenty-five years, recalled for the first time two days before the trial that in 1931 she overheard a heated discussion between Tubby and his father, in which the doctor had said the first wife would not get anything because Tubby has turned over the bulk of his property to him, that he could use it, and that he gave some to Tubby when he needed it, and when he died he would will him everything. On cross examination, she said for the first time that the doctor had used the words "I agree", saying that he said "I agree to will everything to Tubby".

The bill of complaint relies on a contract in 1925. The testimony of three witnesses was as to an agreement relating to the marriage and divorce which occurred in 1927 and 1930, respectively. The testimony of the fourth witness was that the property was going to be Tubby's because of a will "still in effect at that time". The cases require clear and unequivocal evidence of an oral agreement to transfer land and of performance on the part of the claimant sufficient to take the case out of the operation of the Statute of Frauds. The statute is dispensed with only upon a high degree of certainty in the proof of an original undertaking. *Sommerman v. Sommerman,* 217 Md. 151, 158. In *Ledingham v. Bayless,* 218 Md. 108, just decided, we said an alleged oral contract must be scrutinized "* * * with the utmost care to determine if there was an agreement and, if so, the precise terms and provisions agreed to." See also *Semmes v. Worthington,* 38 Md. 298, 327, where the Court, in speaking of oral contracts

to convey, said the rule is that "the contract should be clear and definite, and that the acts done should be equally clear and definite and solely with a view to the performance of the particular agreement." *Withers v. Douglas,* 206 Md. 141, 145, repeated, as the earlier cases had said, that it was not enough that the acts relied on as part performance furnish evidence of some agreement but that they must relate to and be unequivocal evidence of the particular agreement charged in the bill. See also *Neal v. Hamilton,* 159 Md. 447, 449.

We think the appellant did not meet the strict standards of the cases. The testimony from the mouths of the witnesses indicates that whatever understanding there was between father and son was no more than an amorphous agreement that "Father knows best" how to manage Tubby's affairs, and dispose of his property, both during and after his, the doctor's life. In 1925 Tubby was in college, was inexperienced in business and financial matters and was extravagant and gay rather than serious and sensible. The doctor and Tubby may or may not have been right in doing what was done, but neither the fairness, the propriety, nor the wisdom of what was done then are now before us for decision.

What Tubby sued on as a firm contractual right would seem to have been no more than some articulation of the same thought the doctor had in 1921 in his testimony on the petition in the Appold trust case for a monetary allowance for Tubby—that if Tubby's money gave him the means of preserving Glen Wild they both could live reasonably well on the pool of family resources, and Tubby would eventually get, in the way the doctor thought best, the benefit of the ever increasing value of the land.

In contrast to the weakness of the oral testimony as to the contract set up in the bill, is the strength of the writings and the conduct of those involved as indicating there was no firm or binding commitment to will Tubby everything outright. In evidence were a number of letters written in 1953 by the doctor to Tubby and his wife, who then were abroad. The doctor's references to Glen Wild and what he intends to do and not to do, and particularly his statements as to Tubby's connection with and interest in the property or its proceeds,

clearly seem to show that the doctor had no doubt that the property was his to do with and will as he pleased for the best interest of all concerned, as he saw it.

Two weeks after his father died, Tubby received a copy of the will and its codicil, and wrote a letter to the individual executor, in which he showed obvious doubts, if not blunt dissatisfaction, as to the trust restrictions of the will, by a somewhat lengthy discussion of their effects on him; but he did not hint at, much less mention, a contract or promise that entitled him to what he seemed to want—the right to sell the land as he pleased. Rather, immediately after saying that his father had willed to Jimmy certain things (such as family portraits his mother had left him) that were not his to will, he wrote: "There is also a question in my mind as to the land *because I held a mortgage on it that was never paid off* * * *." (Italics supplied.) Cf. *Evans v. Buchanan,* 183 Md. 463, 469-470. His wife, after talking to her husband about the will several times, did not mention a contract to the executor. The 1931 will—executed at a time some of the witnesses say the doctor talked of an obligation to make a will in Tubby's favor—did not leave everything outright to Tubby but left $35,000 to the doctor's sisters and Grace Brenner, and left the rest in trust for Tubby.

The experienced lawyer who drew the will of 1931 also drew the deeds and release between father and son in the 1940-1942 period—he said he represented both—and the antenuptial agreement. He testified he knew of no agreement or contract between father and son. That he did not is shown by his certificate to a Towson bank he represented in connection with a mortgage loan on Glen Wild that Dr. Adams had a fee simple unencumbered title. His testimony was that if he had known of any such claim as Tubby is now making, he would have felt obligated to tell the mortgagee bank about it.

About two months after Dr. Adams died, Tubby's lawyer asked Jimmy to come to his office and, when he did so, told him his father would like him to give him forty acres of Glen Wild. In this importuning no mention was made of any agreement or contract. Twice Jimmy, at his father's request,

talked to him about the will and possible settlements of the caveat case, but again no mention was ever made of any agreement or contract. The writings, and the acts of interested and informed actors in this family testamentary drama, tend to negate Tubby's claim of a contract.

The conclusions we have reached make it unnecessary to consider the effect of the 1940-1942 deeds from father to son and son to father and the release by the son of the father.

Appellant claims reversible error in the refusal of the court to permit Tubby to amplify answers to questions by opposing counsel so as to bring in evidence of the agreement he claimed, and of similar refusals as to testimony by the 1940 lawyer for father and son. It is manifest to us from the record that if the witnesses had been allowed to answer as fully as the rules of evidence permit, the result below and here would not have been changed.

Appellant complains that the chancellor improperly required him to pay the cost of depositions taken by appellees and not used at the trial and that the ruling was an abuse of the discretion given by Maryland Rule 415 b.

We are told that Judge Gontrum made appellant pay the challenged costs because he had brought about the necessity for double depositions by first filing a caveat which he pressed to within five days of trial, before dismissing it, and then filing the specific performance case. We find no abuse of discretion under the circumstances.

*Rulings affirmed, with costs.*