538 A.2d 1201

Anthony J. UNITAS, Personal Representative of the Estate of Raymond V. Rangle

v.

Janet M. TEMPLE.

No. 641, Sept. Term, 1987.

Court of Special Appeals of Maryland.

April 5, 1988.

Certiorari Granted June 24, 1988.

James K. Archibald (Kathleen M. McDonald and Venable, Baetjer and Howard, on the brief), Baltimore, for appellant.

M. Albert Figinski (Franklin Goldstein, David R. Sonnenberg and Julie C. Janofsky and Melnicove, Kaufman, Weiner, Smouse & Garbis, P.A., on the brief), Baltimore, for appellee.

Argued before BISHOP, ALPERT and WENNER, JJ.

ALPERT, Judge.

It is axiomatic among the bench and bar that the Statute of Frauds was enacted by the English Parliament in the year 1677 "for the prevention of frauds and perjuries." That venerable piece of legislation, when viewed over the centuries since its enactment, may have created as many problems as it was intended to resolve:

> Such gain in the prevention of fraud as is attained by the statute is attained at the expense of permitting persons who have in fact made oral promises to break those promises with impunity and to cause disappointment and loss to honest men. It is this fact that has caused the courts to interpret the statute so narrowly as to exclude many promises from its operation on what may seem to be flimsy grounds. The courts cannot bear to permit the dishonest breaking of a promise when they are convinced that the promise was in fact made. The statute of frauds is regarded as a technical defense that often goes counter to the merits.

2 A. Corbin, *Corbin on Contracts* § 275, at 3 (1950) (footnote omitted).

This is a case where the statute was interpreted to avoid an unjustified disappointment and loss. Here the Circuit Court for Baltimore City ordered specific performance of an oral agreement between the decedent, Dr. Raymond V. Rangle, and Janet M. Temple. The personal representative of Dr. Rangle's estate, Anthony J. Unitas, asks this court to reverse the trial court's ruling. The oral agreement allegedly provided that the appellee, Janet M. Temple, was to receive Dr. Rangle's entire estate if she returned to his employ and resumed their personal relationship.

While the trial judge did not find that Janet was entitled to Raymond's entire estate, he did effectively award her a qualified life estate in all of Raymond's property.

The instant case serves as a classic example of how the superficial application of case law interpreting the statute could thwart the statute's *raison d'etre.* Judge Martin B. Greenfeld in a comprehensive, well-reasoned opinion admirably perceived the subject contract's conformance to the statute, as exemplified by his observations:

> In virtually every case cited by either party, the purported promisor either made express provisions for a third party which was contrary to the alleged promise to the plaintiff, or did nothing to implement the alleged promise to the plaintiff. In sharp contrast is the present case, where Raymond, orally and in writing, continuously and consistently expressed his intent to provide financially for Janet, and never made any affirmative attempt to provide preferentially for anyone else. His intent to provide for Janet was manifest, he made the promise, and she acted in reliance on that promise. The only open question was the form this promise would take. The issue therefore was not *whether* Janet was to receive anything, but just how much it would be. To deprive her of everything when Raymond had made clear that he intended her to have something would be unjust.

(Emphasis in original). To give the reader a full measure of appreciation of the trial judge's application of the law to the facts, we deem it appropriate to set out fully his findings of fact, which were "derived from clear and convincing evidence."

> Raymond, an active practicing physician for over 40 years, died suddenly of a heart attack on 6/27/83 at age 67. His 23-year childless marriage had ended in divorce in 1966. Several times over the ensuing years, Raymond expressed to others his continuing bitterness at his former wife having stripped their residence of all of the furnishings, an act which Raymond thought to be contrary to their separation agreement. This, among other things, had made Raymond wary of entering into another marriage.

Janet and Raymond began dating each other in 1968. Janet was then a 26–year old divorcee with one daughter (Little Janet). Janet and Raymond were constant companions virtually without interruption from that time until Raymond's death. Even though Janet and her daughter lived with Janet's parents near Annapolis, and Raymond lived in Baltimore, they spent almost all their waking hours together. They attended all social and family functions together, and Raymond ate dinner with Janet at her parents' house several times each week. As far as Janet's household was concerned, Raymond was one of the family. Raymond and Janet had unabiding [sic] love for each other, which continued unabated until his death. Raymond also gave Janet substantial gifts over the years, including jewelry and furs. Raymond also cared a great deal for Little Janet and constantly gave her gifts and paid substantial monies for her private school education. In most respects, he treated her as if she were his daughter.

Janet began working as a medical secretary in Raymond's office in 1971, and eventually expanded her duties to assisting in the management and bookkeeping for his investment properties. Janet was paid a salary for this office work, which amounted to almost $20,000 per year in 1982, the last full year of her employment before Raymond's death. Since there is no evidence to the contrary, it must be concluded that Janet's salary was adequate for the type of work she performed and the level of skills she possessed.

In 1965 Raymond graduated from law school and in 1971 was admitted to the practice of law. He did some part-time legal work in private practice and then with the State's Attorney's Office in Baltimore City. His primary occupation, however, continued to be the practice of medicine. Indeed, his haphazard approach to legal matters is the cause of this prolonged and costly litigation.

In 1976 Raymond and Janet became engaged, as evidenced by a four-carat diamond ring Raymond presented

to her. Although Janet was willing, Raymond kept evading marriage. This led Janet, on several occasions, to leave Raymond's employ and companionship, but they were short-lived and each time Janet and Raymond reconciled. Janet's concern over her status with Raymond became pronounced in March, 1982 because she had then reached her fortieth birthday and was still not married. This concern reached its zenith on 9/27/82 when Janet told Raymond in her most emphatic terms thus far that, since Raymond had not yet made any provisions for Janet's future despite his past promises and since she was already 40 years old, she was leaving Raymond for good. Janet left the office; Raymond was extremely distraught. For the next few nights, Raymond came to Janet's house and tried to assure Janet and her parents that her fears were unfounded and that Janet didn't have to worry about her pension or future financial security. What assurances and promises were specifically made by Raymond during this critical period is the nub of this litigation. Janet and her parents testified that Raymond stated in unequivocal terms that if Janet would return to work and to him, he would make a will leaving his entire estate to Janet. Other testimony and certain actions of Raymond, however, prevent this Court from concluding that Raymond made such a promise in such absolute terms. For example, Janet also testified that Raymond told her, with regard to a will, that he would take care of her and she wouldn't have to worry. And Janet's father testified that over the years Raymond had stated that Janet and Little Janet would be taken care of and would be provided for. During this period, Raymond told his friend, Adam Cowley, that he had set up a trust for Janet—an indication of something less than an absolute gift.

As recently as July, 1982, Raymond directed his accountant and lawyer, Bernard Carton, to prepare a will leaving his estate in trust to Janet for life provided she remained unmarried, with the remainder to Tony and his descend-

ants. In August, 1982 Mr. Carton sent Raymond that will (which shall be hereafter referred to as "the Carton will"). Furthermore, on October 6, 1982, only one week after Raymond's alleged promise to Janet, Raymond met with a former law school professor, Julius Isaacson, and gave him a photostat of the Carton will, which contained a photostat of Raymond's signature on the last page. Raymond said that this was what "they got me to sign." The Court finds that Raymond signed a copy of the Carton will shortly after discussions with Janet and her parents at the end of September, 1982. At the meeting with Mr. Isaacson on October 6, Raymond directed him to prepare an ante-nuptial agreement and complementary will provisions, which generally provided for leaving his entire estate to Janet when she reached age 60, but only if Janet was married to and living with Raymond at his death and had not remarried before reaching 60. Upon failure of those conditions, half of the estate would go to Tony and his relatives, and the other half to Little Janet. Raymond never signed any of the documents Mr. Isaacson prepared.

Within two months of Raymond's death, he made some handwritten notes to change the Carton will provisions so as to leave everything to Janet upon her reaching 50 and remaining single, but if that gift fails, the estate is to pass in its entirety to *Janet's* direct descendants. These handwritten changes were found in Raymond's car trunk after he died, and their contents had never been communicated to Mr. Carton or anyone else before Raymond died. About two months before Raymond died, he called Janet and another employee with his office and asked them to witness his will. As soon as Raymond signed the document, a telephone call from a patient diverted everyone's attention, and the contemplated witnesses never signed to attest Raymond's signature. The document Raymond signed that day was in fact the Carton will which had been prepared in August, 1982, a copy of which he had already signed between September 27 and October 6,

1982 and given to Mr. Isaacson. This later-signed will was found in the trunk of Raymond's car on the day he died. The contention by Defendant that the signature on the Carton will is not Raymond's is rejected by the Court. Virtually all of the written documents reflect Raymond's intent to make his own relatives the contingent or remainder beneficiaries of his estate. This is consistent with Raymond's familial ties and belies the allegation of an unconditional promise to Janet. Raymond and Tony [Anthony Unitas, appellant] grew up together in the same household and were only six years apart in age. Tony was the best man at Raymond's wedding. Although Raymond spent less time with Tony after his relationship with Janet commenced, Raymond never severed his ties with Tony, nor did he desire to do so.

Based upon Raymond's actions before, during and after Janet's ultimatum at the end of September, 1982, the Court is unable to conclude that Raymond promised unconditionally to leave his entire estate to Janet if she returned to him. It is clear, however, that Raymond did make an affirmative promise to Janet, the import of which was that he would provide for her upon his death in a manner fully adequate to make her financially secure. This assurance was necessary to, and did in fact, induce Janet to resume her employment and personal relationship with Raymond. But for this promise, Janet would not have returned to Raymond as regards either relationship, vocational or social. Raymond never did articulate to Janet the manner in which he would make her financially secure, but the minimum manner in which he intended to implement the promise is reflected in the Carton will which he subsequently signed on two separate occasions.

It is true that Janet testified that she contemplated marriage as the final part of Raymond's promise to provide for her. This is also consistent with Raymond's instructions to Professor Isaacson on 10/6/82. But Janet testified, and this Court agrees, that at the time he made

the crucial assurances to Janet in September, 1982 to provide for her, he did not condition those assurances upon their marriage. Indeed, there is considerable doubt whether Raymond ever resolved in his own mind to marry Janet. He cared for her and wanted to and did in fact promise to provide for her irrespective of their marriage. Janet's assumption that marriage would be forthcoming was only a unilateral expectation and was not a precondition imposed by Raymond in September, 1982.

Although marriage was not a precondition of Raymond's promise to provide for Janet upon his death, their continued relationship was. Needless to say, that relationship continued up to the moment of Raymond's unexpected demise.

(Emphasis in original). After applying the applicable law to those facts, the judge ordered that:

The oral agreement between Janet and Raymond for Raymond to financially provide for Janet upon his death will be enforced in the manner set forth in the Carton will signed by Raymond.

Being dissatisfied with that decision, appellant noted an appeal and in summary asks us to answer the following questions:

1. Was it not clearly erroneous for the Court to conclude that marriage between Janet and Raymond was not a precondition to any promise which Raymond may have made to her in October, 1982, to provide for her in his will?

. . . . .

2. Is the evidence sufficient to support the Court's Decree removing the bar of the Statute of Frauds and granting specific performance of an alleged oral contract to make a will involving real estate?

In her cross-appeal, Janet M. Temple asks:

Did the trial court err in finding a contract to leave Temple only a life estate, based on the draft Carton will, in light of the fact that the Complaint alleged a different

contract (*i.e.,* to leave her the entire estate) and in light of certain handwritten notes in testamentary form which Temple claims constitute clear and convincing evidence of the alleged contract?

## I. Breach of promise to marry

Appellant asserts that the trial judge was clearly erroneous in finding that marriage was not a condition precedent to any financial provision for Janet. He maintains that "any agreement to provide for Janet was predicated on marriage preceded by the execution of an antenuptial agreement." In his written opinion, Judge Greenfeld ruled:

It is true that Janet testified that she contemplated marriage as the final part of Raymond's promise to provide for her. This is also consistent with Raymond's instructions to Professor Isaacson on 10/6/82. But Janet testified, and this Court agrees, that at the time he made the crucial assurances to Janet in September, 1982 to provide for her, he did not condition those assurances upon their marriage. Indeed, there is considerable doubt whether Raymond ever resolved in his own mind to marry Janet. He cared for her and wanted to and did in fact promise to provide for her irrespective of their marriage. Janet's assumption that marriage would be forthcoming was only a unilateral expectation and was not a precondition imposed by Raymond in September, 1982.

We have carefully reviewed the record and hold that there was legally sufficient evidence to support the trial judge's conclusion that Dr. Rangle's promise to provide for Janet was not conditioned on marriage. He was not clearly erroneous. Maryland Rule 1086.

## II. The oral contract to devise

 Maryland law is clear that an oral contract to make a will devising an interest in land [1] is within the Statute of

---

1. Dr. Rangle's estate contained substantial real estate holdings.

Frauds and unenforceable unless (a) there has been part performance; (b) specific performance is necessary to prevent injury amounting to fraud; and (c) the terms of the contract are certain and definite and affirmatively established by clear and convincing testimony. *Hanson v. Urner*, 206 Md. 324, 331–3, 111 A.2d 649 (1955). Each of the above requirements shall be discussed in turn.

(a) Part Performance

Appellant maintains that there was not sufficient part performance to remove this case from the grasp of the Statute of Frauds. Notwithstanding the trial judge's finding that "but for this [Raymond's] promise, Janet would not have returned to Raymond...." Appellant argues that Janet's return "can reasonably be accounted for without reference to a contract for a monetary benefit." Initially, we observe that there was sufficient evidence in the record to warrant the trial judge's finding of fact and thus affirm that there was indeed sufficient part performance to remove the agreement from the effect of the Statute of Frauds. We explain.

Appellant relies upon the seminal case of *Semmes v. Worthington*, 38 Md. 298 (1873), and its progeny to support his position. *Semmes v. Worthington* sets forth time-honored principles applicable to the Statute of Frauds which constitute the view of a majority of our sister states. Judge Alvey set forth the requisite acts necessary to constitute part performance:

> The act relied on as part performance must, in itself furnish evidence of the identity of the contract; and it is not enough that it is evidence of some agreement, but it *must relate to and be unequivocal evidence of the particular agreement charged in the bill....* It adopts the rule that the contract should be clear and definite, and that the acts done should be equally clear and definite and solely with a view to the performance of the particular agreement.... The acts done must be of a substantial nature, and such, that the party would suffer

an injury amounting to a *fraud* by the refusal to execute the agreement.

*Semmes* at 326–327 (emphasis in original).

The underlying rationale then, of the *Semmes* decision and those that follow it,[2] is to prevent fraud. The plaintiff in *Semmes* was seeking specific performance of an oral contract to devise certain real estate in Baltimore County. The decedent left a will which did not include a devise to the plaintiff. The *Semmes* court was reluctant "to set aside a solemn testamentary act of the deceased party, in the absence of all possible explanation of his conduct, and when he is no longer present to vindicate himself against the imputation of bad faith." *Semmes, inter alia,* teaches that the intent of the testator ought not be frustrated.[3] Cases following *Semmes* support its rationale of preventing fraud.

In *Hamilton v. Thirston,* 93 Md. 213, 48 A. 709 (1901), the court stated that in order for part performance to remove a contract from the purview of the Statute of Frauds, the act relied on " '[m]ust be such an act done as

---

**2.** *Beall v. Beall,* 291 Md. 224, 434 A.2d 1015 (1981); *Shimp v. Shimp,* 287 Md. 372, 412 A.2d 1228 (1980); *Adams v. Turnbull,* 218 Md. 606, 147 A.2d 707 (1959); *Serio v. Von Nordeck,* 189 Md. 388, 56 A.2d 41 (1947); *Campbell v. Welsh,* 54 Md.App. 614, 460 A.2d 76, *cert. denied,* 297 Md. 108 (1983).

**3.** Consistent with that principle, Judge Greenfeld found:

An ineffectual will delivered to the legatee may constitute an irrevocable contract. *Scott v. Marden, supra,* 153 Md. [1] at 10–12 [137 A. 518]. Delivery is a salutary safeguard against fraudulent claims, but that is a condition not present here. There is no question that Raymond signed the Carton will, and he did deliver a signed copy to Mr. Isaacson. *Delivery to Mr. Isaacson just as clearly evidences Raymond's intent as delivery to Janet would have.* Ironically, when Raymond gave that copy to Mr. Isaacson, he instructed Mr. Isaacson to prepare documents which would have favored Janet even *more* generously than the Carton will. *To rigidly impose a requirement that the document be delivered to the promisee under the particular facts and circumstances of the case would completely frustrate the minimumly-established intent of the promisor.*

(Emphasis added). None of the cases that we have examined would authorize a holding inconsistent with the intent of the promisor. Considering all of the evidence presented below, there is nothing that contradicts the above factfinding.

appears to the Court would not have been done unless on account of the agreement' and this Court has repeatedly said that such acts must be clear and definite and refer exclusively to the alleged agreement." *Id.* at 219, 48 A. 709 (quoting Lord Hardwicke in *Lacon v. Mertins,* 3 Atk. 4). The Court of Appeals in *Neal v. Hamilton,* 159 Md. 447, 150 A. 867 (1930), held the plaintiff's acts met the requirements of part performance as:

> [t]he acts of part performance are referable to and consistent with the contract alleged, and it would unquestionably be inequitable ... to deny the plaintiff the part remaining unfulfilled by the intestate, when that part is the portion of the consideration which was the moving inducement for the plaintiff to make the promises which she has performed in the reliance and anticipation of the intestate faithfully discharging his promise.

*Id.* at 450–51, 150 A. 867.

In *Neal,* the court differentiated between the performance of ordinary services and services where it was impossible to restore the plaintiff to his original position; the rendition of services in the latter case taking the oral agreement outside the Statute of Frauds. The court stated the latter case is illustrated "if the services are of such a peculiar character that it is impossible to estimate their value by any pecuniary standard, and it is evident that the parties did not intend to measure them by any such standard...." *Id.* at 451, 150 A. 867, citing *Pomeroy on Specific Performance* (3rd ed.), § 114.

A careful examination of *Semmes,* the cases that follow it, and those that distinguish it indicate that the particular facts of each case determine its outcome.[4] Further, this court discerns a pattern with regard to the Maryland cases where the courts have strictly applied the Statute of Frauds

---

**4.** The trial judge observed that: "In virtually every case cited by either party, the purported promisor either made express provisions for a third party which was contrary to the alleged promise to the plaintiff, or did nothing to implement the alleged promise to the plaintiff."

and have failed to find an enforceable contract where there was either some doubt as to the oral promise or a vague and illusory promise.[5] Such doubt or vagueness is not present in the case *sub judice.*

Here the trial judge stated: "While many of the facts are not in dispute, some of crucial importance are." Undoubtedly, the factual dispute that he perceived was with regard

---

**5.** For example, the *Semmes* court, in commenting on the quality of the evidence in the record before it, noted:

> Neither of these witnesses as will be observed, profess to give the exact language of the deceased, nor everything that was said by him; nor do they undertake to state the language of the plaintiff when these propositions were made to him, to show how he understood and in what sense he accepted them. These are the only two witnesses who profess to have any knowledge of the making of the contract; the other witnesses for the plaintiff testifying to declarations of the deceased, all of which are of a vague and indefinite character as evidence of a contract, such as that set up in the plaintiff's bill.

*Id.* at 321. The court's doubt as to the very existence of the alleged oral agreement is apparent.

> By the contract as attempted to be established, the plaintiff became entitled to the devise upon his taking possession and cultivating the farm during the life of his uncle, upon the same terms and in the same manner as before, when merely a tenant, without any reference whatever to the possible change of feeling, or to any future relation that might exist between them. For this extraordinary contract, the only apparent consideration to the deceased, was the preference of one tenant to another to cultivate and manage his estate, on being paid the usual rent. And it is really difficult to imagine that a sensible man, as the deceased is said to have been, would, by solemn contract on such consideration, so entirely denude himself of all power and control over his estate, and place himself in a condition of such dependence in reference to it.

*Id.* 322–323. More than one hundred years later in *Campbell v. Welsh,* 54 Md. App. 614, 622–23, 460 A.2d 76 (1983), we affirmed the lower court's refusal to enforce an oral contract because "the evidence supplied by appellant [was] grossly insufficient" and

> The contract itself is unclear—first an agreement to sell *him* a parcel of land for $2,500, four or five years later an agreement to modify the purchase price by forgiving the unpaid balance of $1,000, and finally a new agreement to leave the property to appellant's daughter who, we note, is not even a party to this proceeding. Even this much we glean only, in the words penned by Justice Grier and quoted by Judge Alvey, "by mere hearsay, or evidence of the declarations of a party to mere strangers to the transaction, in chance conversations. . . ."

to the extent of Dr. Rangle's future financial commitment to Janet M. Temple. Judge Greenfeld found:

> Janet and her parents testified that Raymond stated in unequivocal terms that if Janet would return to work and to him, he would make a will leaving his entire estate to Janet. *Other testimony and certain actions of Raymond, however, prevent this Court from concluding that Raymond made such a promise in such absolute terms.* For example, Janet also testified that Raymond told her, with regard to a will, that he would take care of her and she wouldn't have to worry. And Janet's father testified that over the years Raymond had stated that Janet and little Janet would be taken care of and would be provided for. During this period, Raymond told his friend, Adam Cowley, that he had set up a trust for Janet—an indication of something less than an absolute gift.

(Emphasis added).

The above findings demonstrate the only real dispute of material fact in this case.[6] Obviously, it is not insubstantial, but viewing all of the evidence in this case (unlike *Semmes* and its offspring), there is clearly no dispute surrounding the basis of the trial judge's decision, *i.e.*, that Dr. Rangle would provide Janet M. Temple with financial security. For example, the trial judge said, "He (Raymond) cared for her and wanted to and did in fact promise to provide for her irrespective of their marriage." At another point, the trial judge concluded: "Raymond expressly promised to provide for Janet upon his death in a manner fully adequate to make her financially secure but did not articulate the manner in which this promise would be implemented."

---

**6.** Any contention "by Defendant that the signature on the Carton will is not Raymond's" is not before the court and apparently was abandoned, appellant having represented in his "Statement of Facts" that "[Raymond] then flipped to the last page and signed it [the Carton will]."

Applying the test set forth in *Hamilton v. Thirston*, 93 Md. 213, 48 A. 709, the act " 'would not have been done unless on account of the agreement.' " *Id.* at 219, 48 A. 709 (quoting Lord Hardwicke in *Lacon v. Mertins*, 3 Atk. 4), the trial judge found that Dr. Rangle had agreed to make appellee financially secure if she would return to his employ and social life. Janet did indeed resume her employment and personal relationship with Dr. Rangle, making what was for her, under her then circumstances, a most critical decision.

The advent of Janet's fortieth birthday apparently was psychologically very significant. As Judge Greenfeld put it:

> Janet's concern over her status with Raymond became pronounced in March, 1982 because she had then reached her fortieth birthday and was still not married. This concern reached its zenith on 9/27/82 when Janet told Raymond in her most emphatic terms thus far that, since Raymond had not yet made any provisions for Janet's future despite his past promises and since she was already 40 years old, she was leaving Raymond for good. Janet left the office.

She positively decided she would leave him and thus start a new life for herself. She would find a new way to become financially secure.[7]

In this regard, under the *Hamilton* test, the trial judge found:

> Based upon Raymond's actions before, during and after Janet's ultimatum at the end of September, 1982, the Court is unable to conclude that Raymond promised unconditionally to leave his entire estate to Janet if she returned to him. It is clear, however, that Raymond did

---

7. On direct examination, Janet indicated that she said:
 Ray, all of these good years wasted and you still haven't done anything, you haven't done what you said you were going to do, that's it. I won't wait any longer. I'm forty years old, and I walked out of the office and out of his life and I told him not to, not to—just to let me alone, let me try to pick up the pieces.

make an affirmative promise to Janet, the import of which was that he would provide for her upon his death in a manner fully adequate to make her financially secure. This assurance was necessary to, and did in fact, induce Janet to resume her employment and personal relationship with Raymond. *But for this promise, Janet would not have returned to Raymond as regards either relationship, vocational or social.*

(Emphasis added). This finding of fact, which clearly establishes the requisite degree of part performance, may not be tampered with unless clearly erroneous. Rule 1086. Indeed, the function of this court "is not to determine whether, on the evidence, it might have reached a different conclusion [than did the trial court]. Rather, [we are] to decide only whether there is any evidence legally sufficient to support the findings of the trier of fact...." *Pahanish v. Western Trails, Inc.*, 69 Md.App. 342, 354, 517 A.2d 1122 (1986). None of the evidence presented by appellant disputes the evidence that amply supported the trial judge's findings. Thus, there is no basis whatsoever for determining those findings are clearly erroneous. Indeed, they are clearly correct based upon the record.

(b) Injury Amounting to Fraud

Appellant quite correctly posits that:

The cases also require that before the bar of the Statute may be removed and specific performance of a contract be ordered the acts of part performance must be of a substantial nature and such that failure to order performance would result in injury to plaintiff amounting to fraud.

Not unexpectedly, he goes on to charge that "Judge Greenfeld, in his Opinion, dealt with the fraud issue in summary fashion." We disagree.

Judge Greenfeld found that since "Janet fully complied with her part of the bargain," denying enforcement of the agreement "would be so unfair to Janet as to be tantamount to a fraud." In order to analyze properly the

trial judge's finding, we must view it within the context in which it was made. The trial judge had quoted extensively from *Hanson v. Urner* and noted in part that "[e]quity assumes jurisdiction in such a case *to prevent an injury amounting to a fraud....*" (Emphasis in original). Following its lengthy recitation from *Hanson,* the court concluded thusly:

> The past [sic] performance requirement was satisfied when Janet resumed her employment and social relationship with Raymond. Although the value of Janet's employment services can be readily ascertained, the value of the personal or social services cannot. And Janet would not have resumed one type of service without resuming the other. As to the personal aspects of the relationship, "it is impossible to restore the parties to their original position." *Id.* at 332. Without Raymond's promises, Janet would not have fulfilled her part of the bargain by returning to Raymond. The resumption of their relationship was incalculable to both parties. Based on these facts, it must be readily concluded that the agreement was fair and reasonable, it was founded on adequate consideration, Janet fully complied with her part of the bargain, and it would be so unfair to Janet as to be tantamount to a fraud to deny enforcement of the agreement.

We must remember that Janet was at a crossroad in her life. As it probably appeared to her at that time, she could go back to Raymond's empty promises and face great financial difficulties in the twilight of her life, or as an alternative she could sever ties with Raymond and start anew—possibly find another life's companion who could render her both socially and financially secure. The record is clear that in consideration of Raymond's promises to make her financially secure, she chose the former path, abandoning the latter. That she ultimately received a lesser included portion of what she perceived to be Raymond's offer—to leave her his entire estate—does not render her decision less decisive nor the consideration less valuable.

The court could and did conclude that there was an offer and acceptance and "adequate consideration." There were all the trappings of a valid contract, the general rules of contract law being applicable. *See* 94 C.J.S. *Wills* § 111 (1956); 1 W. Bowe & D. Parker, *Page on the Law of Wills* § 10.18 (4th ed.'1960).

In *Mannix v. Baumgardner*, 184 Md. 600, 42 A.2d 124 (1945), the testator's step-daughter (appellee) filed suit against the executrix of the testator's estate to specifically enforce an oral contract by the testator to devise to his stepdaughter all of his estate upon his death, in return for the stepdaughter's services, all of which had been fully performed. The testator initially executed a will devising his real estate to the stepdaughter, but subsequently revoked that will by executing a second will in favor of his sister. The Circuit Court for Frederick County decreed specific performance of the oral contract. Affirming that judgment, the Court of Appeals declared that: "To permit the second will to prevail in such circumstances would work a fraud upon the legitimate interests and rights and expectations of the appellee." *Id.* at 606, 42 A.2d 124.

We paraphrase that holding by saying that to permit intestacy to prevail in the case *sub judice* would work a fraud upon the legitimate rights and expectations of the appellee herein.

(c) Definiteness of the oral contract

The law is clear that the terms of an oral agreement to devise property "must be certain and definite and must be affirmatively established by clear and convincing testimony ... [m]oreover, the rule is thoroughly understood that an oral contract to devise real property in consideration of services rendered may be established by parol evidence of witnesses who were not present at the making of the contract." *Hanson v. Urner*, 206 Md. at 333–34, 111 A.2d 649. The *Hanson* court adds a caveat that "[i]t is not sufficient to show merely that the statements and the conduct of the decedent raised the hopes and expectations

of the complainant." *Id.* at 335, 111 A.2d 649. In holding that the complainant met her burden of proof to show the existence of an oral contract, the *Hanson* court looked to the purpose of the decedent's devise, a will and codicil carrying out that purpose and the testimony of witnesses of the existence of the oral promise.

 In the case *sub judice*, the trial court found that "Raymond never did articulate to Janet the manner in which he would make her financially secure, but the minimum manner in which he intended to implement the promise is reflected in the Carton will which he subsequently signed on two separate occasions." But that does not end the court's discussion on that point. Later on in his opinion, Judge Greenfeld stated:

> The Court is mindful of the requirement that, to be enforceable, the terms of the agreement must be "certain and definite," *Id.* at 333 [111 A.2d 649]. Raymond expressly promised to provide for Janet upon his death in a manner fully adequate to make her financially secure but did not articulate the manner in which this promise would be implemented. Without anything more, a court could not enforce such an undefined promise. Of crucial significance, however, is the fact that Raymond reduced to writing on two occasions the specific manner in which he intended to implement this promise. The first instance was when he signed the Carton will almost contemporaneously with his making the promise to Janet; and the second was shortly before his death in the presence of two witnesses.

> . . . . .

> Admittedly, it would be imprudent for a court to attempt to fashion the terms of an agreement out of whole cloth. But where, as here, an overly general agreement has been precisely refined by the promisor in a writing delivered to a third party, equitable principles fully justify the enforcement of that writing.

The "Carton will" provided the requisite certainty. Additionally, there are numerous cases throughout the country that have considered the certainty of promises to leave property upon death by will or otherwise. *See* the cases cited at 94 C.J.S. *Wills* § 111, n. 87.

*Ledingham v. Bayless,* 218 Md. 108, 115, 145 A.2d 434 (1958), is instructive. Here, as in *Ledingham:*

> We do not have a case, like so many of this sort, where the claim is under an oral contract which the court must scrutinize with the utmost care to determine if there was an agreement and, if so, the precise terms and provisions agreed to.

Dr. Rangle's promise to take care of Janet has yet to be contradicted. The fulfillment of that promise, as embodied in the terms of the Carton will, is set out in precise terms and is consistent with the overall tenor of the promise. As the Court of Appeals went on to state in *Ledingham:*

> The authorities make it plain that if there is a contractual obligation under which property is to pass at the death of the promisor, a contract to bequeath or devise will be implied, although there is no express undertaking by the promisor to execute a will. A promise that the promisee shall receive the property, or that it shall be his at the death of the promisor, is sufficient *and it is not necessary that the means by which title is to pass shall be spelled out.*

*Id.* at 115–16, 145 A.2d 434 (emphasis added).

That Raymond did not complete the formal execution of the Carton will ought not, as appellant would urge, totally defeat Janet's contractual right to financial security. As the Court of Appeals stated in *Ledingham:*

> Where a promisor in an agreement to devise property has failed to meet his obligation, in whole or in part, the promisee will be given equitable relief if the contract is fair and reasonable and founded upon sufficient consideration and the parties cannot be restored to their original position.

*Id.* at 117, 145 A.2d 434.

Appellant, however, argues that "[t]he evidence does not establish clearly and convincingly the certain and unambiguous terms of the contract." He urges reversible error in the trial court's alleged disregard of the teachings of *Semmes:* "It [the trial court] indulged in latitude of construction when there was uncertainty in the case presented." We cannot allow appellant's concept of "uncertainty" to lead us astray. Professor Arthur C. Corbin's analysis on this point is illuminating:

> Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement, have often been held to prevent the creation of an enforceable contract.

> Generalizations like the foregoing no doubt render some service in the administration of the law; but they may result in serious injustice unless they are applied with common sense in the light of much experience. Vagueness, indefiniteness, and uncertainty are matters of degree, with no absolute standard for comparison. It must be remembered that all modes of human expression are defective and inadequate.

> . . . . .

> If the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left.

> The fact that the parties have left some matters to be determined in the future should not prevent enforcement, if some method of determination independent of a party's mere "wish, will, and desire" exists, either by virtue of the agreement itself or by commercial practice or other usage or custom. This may be the case, even though the determination is left to one of the contracting parties, if he is required to make it "in good faith" in accordance

with some existing standard or with facts capable of objective proof.

1 A. Corbin, *Corbin on Contracts* § 95 (1950). Judge Greenfeld correctly found the "Carton will" was objective proof. Reliance on a will that was ineffective to make a testamentary disposition to establish terms of an alleged contract is not without precedent. In *Mannix v. Baumgardner*, 184 Md. 600, 42 A.2d 124 (1945), the revoked will "was not admitted as a testamentary document; as such, it was revoked by the later will." But it was properly admitted as a part of the chain of circumstances tending to support the existence of a prior verbal contract to make a devise by will." *Id.* at 607, 42 A.2d 124. The court went on to quote *Wilks v. Burns*, 60 Md. 64, 70 (1883):

> The testamentary document is nothing more than a part of the contract, which has been determined by mutual stipulations, controlling the mind of the testator.... If the proof is sufficient, the Court decrees a specific performance of the contract; the will being examined merely to ascertain the terms of such contract, of which it has become a part.

*See also Scott v. Marden*, 153 Md. 1, 137 A. 518 (1927).

### Conclusion

As noted earlier, appellant asks:

> Is the evidence sufficient to support the Court's Decree removing the bar of the Statute of Frauds and granting specific performance of an alleged oral contract to make a will involving real estate?

In summary, we respond by adopting the words of the trial judge:

> In virtually every case cited by either party, the purported promisor either made express provisions for a third party which was [sic] contrary to the alleged promise to the plaintiff, or did nothing to implement the alleged promise to the plaintiff. In sharp contrast is the present case, where Raymond, orally and in writing, continuously and consistently expressed his intent to pro-

vide financially for Janet, and never made any affirmative attempt to provide preferentially for anyone else. His intent to provide for Janet was manifest, he made the promise, and she acted in reliance on that promise. The only open question was the form this promise would take. The issue therefore was not *whether* Janet was to receive anything, but just how much it would be. To deprive her of everything when Raymond had made clear that he intended her to have something would be unjust.

## The Cross Appeal

■ Janet M. Temple, as cross-appellant, asserts that the trial court was clearly erroneous in failing to enforce the contents of the handwritten notes found posthumously in the decedent's trunk as the terms of the alleged oral agreement between Raymond and Janet. The trial court found an agreement different from that alleged by the appellee in her complaint. We hold that the trial court was not clearly erroneous in failing to enforce, as the terms of the alleged oral agreement, the contents of the handwritten notes found in the decedent's trunk after his death. The reasons assigned for implementing the terms of the "Carton will" not only serve to establish the propriety of that decision but also simultaneously support the non-enforcement of the contents of the handwritten notes.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.

WENNER, J., dissents with opinion.

WENNER, Judge, dissenting.

I agree with the majority's holding that "the trial judge was not clearly erroneous in finding as a fact that Dr. Rangle's promise to provide for Janet was not conditioned on their marriage." I also agree with the majority's holding on the cross-appeal that "the trial court was not clearly erroneous in failing to enforce, as the terms of the alleged oral agreement, the contents of the handwritten notes

found in the decedent's trunk after his death." I respectfully dissent from Part II of the majority's opinion, however, because I believe the oral agreement between Dr. Rangle and Janet is within the Statute of Frauds. I disagree with the majority's reliance on the signed, but unwitnessed, Carton will to establish the terms of the contract.

The majority correctly states that an oral contract to make a will devising an interest in land is within the Statute of Frauds and is unenforceable,[1] *Hanson v. Urner,* 206 Md. 324, 331, 111 A.2d 649 (1955), unless: (1) there has been part performance; (2) specific performance is necessary to prevent injury amounting to fraud; and (3) the terms of the oral contract are certain and definite and affirmatively established by clear and convincing testimony. *Hanson* at 331–35, 111 A.2d 649. But I disagree with the majority's conclusion that "[t]he fulfillment of [Dr. Rangle's] promise [to Janet] as embodied in the terms of the Carton will, is set out in precise terms and is consistent with the overall tenor of [his] promise." I shall discuss each of these requirements in turn.

### (1)

In *Semmes v. Worthington,* 38 Md. 298 (1893), the complainant sought specific performance of an oral agreement to convey land by will, and defended against the Statute of Frauds on the ground of part performance. In *Semmes,* Judge Alvey, speaking for the Court, addressed the nature of the acts sufficient to constitute the requisite part performance:

> The act relied on as part performance must, in itself furnish evidence of the identity of the contract; and it is not enough that it is evidence of some agreement, but it *must relate to and be unequivocal evidence of the particular agreement charged in the bill. Canal Co. v. Young,* 3 Md. 480. And the court is never anxious to grasp at slight circumstances to rescue a case from the

---

1. Dr. Rangle's estate contained substantial real estate holdings.

operation of the Statute, nor does it indulge in any latitude of construction, where there is any equivocation or uncertainty in the case presented.[2] It adopts the rule that the contract should be clear and definite, and that the acts done should be equally clear and definite and solely with a view to the performance of the particular agreement.... The acts done must be of a substantial nature, and such, that the party would suffer an injury amounting to a *fraud* by the refusal to execute the agreement.

*Semmes,* 38 Md. at 326–327 (Emphasis in original). The Court held that the acts alleged as part performance (possession and cultivation of a farm) were not sufficient to remove the agreement from the Statute of Frauds.

*Hamilton v. Thirston,* 93 Md. 213, 48 A. 709 (1901) involved an alleged oral agreement by an uncle to devise a child's portion of his estate, consisting of real estate and personal property to his nephew, if the latter would render certain services to him during the remainder of the uncle's life. The uncle died intestate. The action was at law and sought money damages. The Court held that the contract was within the Statute of Frauds and was thus void. The Court also said even if the proceeding were filed in equity, it was doubtful whether the evidence of part performance was sufficient to take the case out of the Statute because the act relied on "[m]ust be such an act done as appears to the court would not have been done unless on account of the agreement; and this court has repeatedly said that such acts must be clear and definite and refer exclusively to the alleged agreement." *Id.* at 219, 48 A. 709. The Court added that "[t]he services appearing by the record to have been rendered by the appellee although considerable in amount and covering a period of some years were such as might well have been rendered by a nephew to an aged

---

**2.** I find it interesting that the majority has deleted this sentence from its quotation of *Semmes.* See Part 3 of this opinion.

uncle without the existence of any contract in reference to them." *Id.* at 219, 48 A. 709.

In *Campbell v. Welsh,* 54 Md.App. 614, 460 A.2d 76, *cert. denied,* 297 Md. 108 (1983), appellant filed an equity action against his mother's estate claiming that in 1965 he and his mother entered into a "verbal agreement" under which she agreed to sell a part of her property to him. Appellant, who was in the construction business, took possession of a portion of his mother's land, built improvements on it that he used in his business, and renovated an existing house for use as his home. He built a driveway from the house to the road, planted some trees, and maintained the yard. Appellant also claimed that he had paid his mother $1500 for the land. After citing with approval the above quoted language from *Semmes,* we held that appellant's acts of part performance were not enough to remove the agreement from the Statute of Frauds. *Campbell,* 54 Md.App. at 623, 460 A.2d 76.

In the case *sub judice,* the trial judge found that Dr. Rangle had agreed to make appellee financially secure if she would return to his employ and social life, and that appellee did in fact resume her employment and personal relationship with Dr. Rangle. I do not believe, however, that these were acts that "would not have been done unless on account of the agreement." [3] *Hamilton,* 93 Md. at 219, 48 A. 709. Nor were they "unequivocal evidence of the particular agreement charged in the bill." *Semmes,* 38 Md. at 326–327. The evidence clearly established that Dr. Rangle and appellee were lovers; appellee testified that she enjoyed her social life with Dr. Rangle and expected no compensation for it. Moreover, appellee received an adequate salary for her work. Further, appellee testified that when she returned to Dr. Rangle in September of 1981, it

---

**3.** Appellee alleged in her complaint an agreement to leave her Dr. Rangle's entire estate. The trial court found that Dr. Rangle had agreed to make appellee financially secure. I shall discuss this in Part 3 of this opinion.

was because she loved him, he needed her, and he was getting his affairs in order so that they could get married. We believe these same factors bore heavily on her decision to return to Dr. Rangle in 1982. Thus appellee's acts evidence her love and desire to marry Dr. Rangle and might well have been done without the existence of any contract. *Hamilton,* 93 Md. at 219, 48 A. 709.

(2)

In order to remove the bar of the Statute of Frauds, appellee must also show that her acts of part performance were of a substantial nature, such that she would suffer an injury amounting to fraud by the refusal to enforce the agreement. *Hanson v. Urner,* 206 Md. 324, 332, 111 A.2d 649 (1955), *Mannix v. Baumgardner,* 184 Md. 600, 604, 42 A.2d 124 (1945), *Neal v. Hamilton,* 159 Md. 447, 451, 150 A. 867 (1930), *Campbell v. Welsh,* 54 Md.App. at 621, 460 A.2d 76, (quoting *Semmes v. Worthington,* 38 Md. at 327).

In his written opinion, the trial judge dealt with this requirement in summary fashion stating that "it would be so unfair to Janet as to be tantamount to fraud to deny enforcement of the agreement." I believe that conclusion is clearly erroneous. Under the alleged agreement, appellee merely resumed her regular job, at pay the court found to be fully adequate, and resumed her social life with Dr. Rangle, for which, as we have noted, she testified she expected no compensation. Certainly appellee was not defrauded when she got full pay for her job, engaged in a social life which she enjoyed, and received substantial amounts of money and gifts. The circumstances of the instant case are clearly distinguishable from those in cases cited by the trial judge such as *Hanson v. Urner, supra,* (alleged oral contract to leave real and personal property to complainant on condition that she come to Hagerstown and serve as decedent's housekeeper and nurse as long as decedent lived); *Mannix v. Baumgardner, supra,* (alleged oral contract to leave real estate to step-daughter on condition that she and her husband and two children move in with decedent and care for him until his death); *Neal v.*

*Hamilton, supra,* (oral contract to devise estate in exchange for claimant's promise to move to Baltimore and serve the intestate until his death). In those cases, the claimant undertook to render arduous services until the death of the promisor, with very little current pay. The Court of Appeals enforced those contracts because of the disparity between the acts performed and the pay received.

(3)

As the majority correctly notes, the law requires that the terms of an oral contract to devise real estate be certain and definite and affirmatively established by clear and convincing testimony proving that the minds of the parties met on definite terms. *Hanson v. Urner, supra. Accord, Adams v. Turnbull,* 218 Md. 606, 147 A.2d 707 (1959), *Serio v. Von Nordeck,* 189 Md. 388, 56 A.2d 41 (1947), *Lorenzo v. Ottaviano,* 167 Md. 138, 173 A. 17 (1934), *Neal v. Hamilton, supra, Soho v. Wimbrough,* 145 Md. 498, 125 A. 767 (1924), *Semmes v. Worthington, supra,* and *Campbell v. Welsh, supra.* It is not sufficient to show that the statements and conduct of the decedent raised the hopes and expectations of the claimant. *Hanson,* 206 Md. at 335, 111 A.2d 649.

In *Soho v. Wimbrough,* the claimant sought to enforce an oral family agreement under which she agreed to live with and take care of her mother in exchange for her mother's promise to leave the claimant certain real estate on her death. In discussing oral contracts to devise, the Court said that the law

> ... does not look with favor upon agreements of this character, and the contract relied on must be set out in the bill of complaint, and *must be certain and unambiguous in all its terms.*
>
> \* \* \* \* \* \*
>
> The proof of the agreement as alleged must be definite and certain, strong and convincing, and such as *not to leave any material part of the contract to conjecture or speculation.*

This Court has held in numerous cases that, upon an application for the specific performance of an executed agreement, the complainants must prove, not only that the agreement was made, but *must also so clearly and fully show its terms that the court can have no difficulty in knowing what they are.* The bill of complaint must allege an agreement, the terms of which are clear, definite and conclusive, and the evidence must be sufficient to prove the allegations. (emphasis supplied).

*Soho,* 145 Md. at 510, 125 A. 767. *Accord, Semmes, supra,* 38 Md. at 327. ("[T]he court is never anxious to grasp at slight circumstances to rescue a case from the operation of the Statute, nor does it indulge in any latitude of construction, where there is any equivocation or uncertainty in the case presented.")

The Court in *Soho* concluded that the alleged agreement did not meet these requirements. The Court said that even if the agreement were sufficiently proven, the Statute of Frauds would bar its enforcement as the terms of the agreement itself and the acts relied on to establish part performance were so conflicting and contradictory that a court of equity should not grant the relief prayed. *Soho,* 145 Md. at 512, 125 A. 767.

In the case *sub judice,* the trial judge rejected appellee's testimony, as well as that of her parents, and the allegation of appellee's complaint, that Dr. Rangle had contracted to leave her his entire estate. Obviously then, appellee did not prove the allegations of the complaint as required by *Soho.* As I have pointed out, the judge found instead that Dr. Rangle promised "to provide for Janet upon his death in a manner fully adequate to make her financially secure," and that it was this promise which induced appellee to return. The judge conceded that Dr. Rangle did not articulate the manner in which this promise would be implemented and that without more, such an undefined promise could not be enforced. Nonetheless, instead of finding that the agreement was too vague in it terms to be enforceable, the trial court proceeded to supply the terms of the agreement

(terms not alleged in the appellee's complaint) thereby ig-noring the law as set forth in *Semmes, Soho* and *Hanson.*[4] In an attempt to make the terms of the agreement specific, the trial court looked to a portion of the Carton will, although the testimony showed that *appellee was not aware of its contents.* Thus the court's use of the Carton will to establish the necessary meeting of the minds was clearly erroneous. *See Hanson,* 206 Md. at 335, 111 A.2d 649.

To be sure, several cases have held that an unexecuted will may be used to *corroborate* the agreement alleged in the complaint. *Mannix v. Baumgardner, supra, Scott v. Marden,* 153 Md. 1, 137 A.2d 518 (1927). Here, however, the will provision was *in conflict* with the agreement al-leged in the complaint. Obviously, then, the trial court did not use the Carton will to corroborate the alleged agree-ment; it used the Carton will to supply the missing terms of the agreement it found. This the court may not do. *See Hanson,* 206 Md. at 335, 111 A.2d 649, *Semmes,* 38 Md. at 326–327, *Lorenzo v. Ottaviano,* 167 Md. at 150, 173 A. 17.

Nevertheless, the majority quotes with approval 1 A. Corbin, *Corbin on Contracts,* § 95 (1950), to support the trial court's use of the Carton will to supply the missing terms of the agreement. The majority fails to point out, however, that the section it relies on deals with vagueness and indefiniteness in the formation of contracts under gen-

---

**4.** The majority's reliance on *Ledingham v. Bayles,* 218 Md. 108, 145 A.2d 434 (1958) is interesting. *Ledingham* was a bill in equity by a son against his brother and sister for specific performance of a written contract he had made with their deceased parents which provided that, if he would work their farm, he, at the death of the survivor, would "be considered the legal owner of one-half undivided interest" in the farm, "having purchased this with his effort". It was on that basis that the court in *Ledingham* held the contract to be a valid contract to devise which was specifically enforceable. And it was in that context that the court said: "A promise that the promisee shall receive the property, or that it shall be his at the death of the promisor, is sufficient *and it is not necessary that the means by which title is to pass shall be spelled out." Id.* at 115–16, 145 A.2d 434 (Emphasis added by the majority).

eral contract law, not contracts within the Statute of Frauds. Thus, it is the majority's concept of "uncertainty" which "leads [it] astray."

Moreover, the trial court did not say that the Carton will embodied the definite terms of the agreement but rather characterized it as expressing "the minimum manner in which [Dr. Rangle] intended to implement his promise." Therefore, even if it were proper to use the Carton will to establish the terms of the agreement, this statement by the trial court makes it evident that even after resort to the will, the terms of the alleged agreement are not certain and definite.

I also note that in her complaint, in addition to asking the court to find an agreement to leave her Dr. Rangle's entire estate, appellee asks the court to construe the agreement. Clearly, the case law precludes a court from construing such an agreement. If the terms of the agreement are sufficiently vague and ambiguous to require construction, the agreement cannot meet the strict standard for removing it from the Statute of Frauds. Indeed, the very fact that appellee alleges in her complaint an agreement different from that found by the trial court points up the ambiguity of the alleged agreement.

The flaw in the trial judge's reasoning is further apparent when he says in his written opinion:

> [Dr. Rangle's] intent to provide for Janet was manifest, he made the promise, and she acted in reliance on that promise. The only open question was the *form* this promise would take. The *issue* therefore was not whether Janet was to receive anything, but *just how much it would be.* To deprive her of everything when Dr. Rangle had made clear that he intended her to have *something* would be unjust. (Emphasis supplied).

It is obvious from his statement that the trial judge found the terms of the agreement to be far less than clear and definite.

Of course, if Dr. Rangle had wanted appellee to have what was provided for her in the Carton will, he need only have had the will attested by two witnesses. Md.Est. & Trusts Code Ann. § 4–102 (1974). I believe that Dr. Rangle's failure to make a valid will was consistent with his conduct throughout his entire relationship with appellee. Her testimony reveals that over the many years of their relationship Dr. Rangle appeased her by saying he was "getting his affairs in order." Needless to say, he died without doing so.

I believe that my reasoning is consistent with the policy behind the strict standards applicable to oral contracts to devise. Courts must be cautious in enforcing an oral contract which disposes of the deceased's property when the deceased is no longer present to explain his conduct or intentions. *See Hanson v. Urner,* 206 Md. at 333, 111 A.2d 649, *Shimp v. Shimp,* 287 Md. at 384, 412 A.2d 1228, *Hamilton v. Thirston,* 93 Md. at 218, 48 A. 709.

In sum, while I understand appellee's disappointment in Dr. Rangle's failure to provide for her in any manner upon his death, I do not believe that the majority should allow its sympathy for appellee to distort the well established principles governing oral contracts to devise. While it may be true, as the majority observes, that the Statute of Frauds, "when viewed over the centuries since its enactment may have created as many problems as it was intended to resolve," the law in Maryland on the subject is clear—at least it was until today.

I would reverse as to Part II.