552 A.2d 1285

**Anthony J. UNITAS, Personal Representative of the Estate of Raymond V. Rangle**

**v.**

**Janet M. TEMPLE.**

**No. 47, Sept. Term, 1988.**

Court of Appeals of Maryland.

Feb. 9, 1989.

James K. Archibald (Edmund P. Dandridge, Jr., Venable, Baetjer and Howard, Baltimore), on brief, for petitioner.

M. Albert Figinski (Franklin Goldstein, David R. Sonnenberg, Julie C. Janofsky, Melnicove, Kaufman, Weiner, Smouse & Garbis, P.A., Baltimore), on brief, for respondent.

Argued before ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS, BLACKWELL, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals of Maryland (retired), Specially Assigned.

RODOWSKY, Judge.

The late Raymond V. Rangle, M.D. (Rangle) died intestate in June 1983 at age sixty-seven. After his death his long time fiancee and lover, Janet Marsha Temple (Temple), the respondent, brought this action to enforce an alleged oral contract under which Rangle was to provide for Temple in his will. Although Rangle's estate included realty, the circuit court held that the statute of frauds was inapplicable because of part performance by Temple. The Court of Special Appeals agreed. *Unitas v. Temple*, 74 Md. App. 506, 538 A.2d 1201 (1988) (Wenner, J., dissenting). Because the evidence relied upon by the courts below does not constitute part performance as a matter of law, we shall reverse.

Rangle and Temple began dating in 1968. He was then fifty-two years of age and had been practicing medicine since 1943. His 1943 marriage, which was childless, ended in a 1966 divorce. In 1968 Temple was a twenty-six year old divorcee with one child, Janet Custer Temple (Janet), who was born in 1964.

Rangle's next of kin was his sister, Julia Unitas, now deceased. She had one child, Anthony J. Unitas (Unitas). Rangle and Unitas grew up in the same household and were only six years apart in age. Unitas was the best man at Rangle's wedding. The trial court found that "[a]lthough

[Rangle] spent less time with [Unitas] after [Rangle's] relationship with [Temple] commenced, [Rangle] never severed his ties with [Unitas] nor did [Rangle] desire to do so." After Rangle's death, Julia Unitas renounced in favor of her son who, in his capacity as personal representative of Rangle's estate, is the petitioner before this Court.

In 1971 Rangle employed Temple in his medical office. In addition to her duties in connection with the medical practice, Temple later assisted Rangle in the management of and bookkeeping for his investment properties. By 1982 Temple's salary for this office work was almost $20,000 per year. The trial court found this salary to be "adequate for the type of work she performed and the level of skills she possessed."

Rangle was also a lawyer. He had graduated from law school in 1965 and had been admitted to the bar in 1971. He did not maintain an office for the practice of law. Rangle was appointed as a part-time assistant state's attorney by former Baltimore City State's Attorney William A. Swisher and Rangle devoted two half-days per week to those duties.

The trial judge found that, from the time Rangle and Temple began dating until Rangle's death, they were "constant companions virtually without interruption." The court gave the following description of their relationship:

"Even though [Temple] and her daughter lived with [Temple's] parents near Annapolis, and [Rangle] lived in Baltimore, they spent almost all their waking hours together. They attended all social and family functions together, and [Rangle] ate dinner with [Temple] at her parents' house several times each week. As far as [Temple's] household was concerned, [Rangle] was one of the family. [Rangle] and [Temple] had [an] abiding love for each other, which continued unabated until his death. [Rangle] also gave [Temple] substantial gifts over the years, including jewelry and furs. [Rangle] also cared a great deal for ... Janet and constantly gave her gifts and paid substantial monies for her private school education.

In most respects, he treated her as if she were his daughter.

. . . .

"In 1976 [Rangle] and [Temple] became engaged, as evidenced by a four-carat diamond ring [Rangle] presented to her. Although [Temple] was willing, [Rangle] kept evading marriage. This led [Temple], on several occasions, to leave [Rangle's] employ and companionship, but they were short-lived and each time [Temple] and [Rangle] reconciled." [1]

On August 14, 1980, the couple obtained a marriage license which was never used. Temple testified that Rangle insisted upon getting an antenuptial agreement and an accompanying Last Will and Testament in order to arrange his affairs preliminary to marriage. In November of 1980, at Rangle's request, one of his former professors at law school, Julius Isaacson, Esq. (Isaacson), prepared a draft of a prenuptial agreement which was never executed. Under that draft Temple would have renounced all interest in Rangle's estate and received a lump sum, the amount of which was left blank in the draft.

In mid-August 1981, when Temple was about to leave for an annual family vacation in Ocean City, Maryland, she told Rangle that she would not be returning to her job at his office. She explained:

"We had a very heated discussion about having had the marriage license for a year.... It had expired, and we had not used it. We hadn't gotten married. I was really, really upset, and I said, 'This is it, Raymond. You have

---

1. Temple's father, Arthur W. Custer, Sr., testified that Rangle and Temple had "small disputes" in addition to the "couple of serious ones," which we describe, *infra.* Mr. Custer said:

"[Temple] would come home on a weekend when she had finished her week's work, whatever, and he would come down the house to take her down to Cambridge. She wouldn't go, and they would have different little arguments. Then he would come back up on the Sunday and come by the house and have dinner and talk and they would go out for a ride and finally come back. She would go back to work on Monday."

had a year to get your affairs in order, to get the will together, to get the antenuptial agreement. It is over.' "

By the first of October, Temple had come back to Rangle. She testified that she did so because she loved him, she knew that he needed her, and he said that he was getting his affairs in order preliminary to marriage.

Rangle's accountant was Bernard Carton (Carton) who is both a C.P.A. and an attorney. In July of 1982, when Carton was in Rangle's office to prepare quarterly governmental reports, Rangle gave Carton instructions for a will, which Carton prepared by August. That paper writing (the Carton Will) was signed by Rangle sometime between September 27 and October 6, 1982, but was never attested and signed by two witnesses. *See* Md.Code (1974), § 4–102 of the Estates and Trusts Article. The Carton Will would have created a trust, the income from which was to be used for tuition, including post-graduate studies, for Janet and the balance of the income was to be paid to Temple for life, so long as she remained single. Temple never knew the terms of the Carton Will during Rangle's lifetime.

The theory of the complaint in the instant action, and the theory on which Temple presented her case to the circuit court, was that the oral contract was formed around the end of September 1982 and that Rangle had promised to leave Temple his entire estate. The events of those days were summarized by the trial court as follows:

"[Temple's] concern over her status with [Rangle] became pronounced in March, 1982 because she had then reached her fortieth birthday and was still not married. This concern reached its zenith on 9/27/82 when [Temple] told [Rangle] in her most emphatic terms thus far that, since [Rangle] had not yet made any provisions for [Temple's] future despite his past promises and since she was already 40 years old, she was leaving [Rangle] for good. [Temple] left the office; [Rangle] was extremely distraught. For the next few nights, [Rangle] came to [Temple's] house and tried to assure [Temple] and her parents that her fears were unfounded and that [Temple]

didn't have to worry about her pension or future financial security."

Temple and her parents testified[2] that Rangle stated in unequivocal terms that if Temple would return to work and resume their social relationship, he would make a will leaving his entire estate to Temple.

On October 6, 1982, Rangle again met with Isaacson and gave him instructions for an antenuptial agreement and complementary will provisions. At that time Rangle delivered to Isaacson a photostat of the Carton Will, undated and unwitnessed, but bearing Rangle's signature. The drafts prepared by Isaacson in general provided for Rangle's entire estate to go to Temple at age sixty if, at the time of Rangle's death, she and Rangle were married and living together and if, by that age, she had not remarried. Upon failure of those conditions, half of Rangle's estate would go to Unitas and his relatives, and the other half to Janet. Rangle never signed any of these documents. Nor did Rangle ever show these documents to Temple.

By October 12, 1982, Temple was back at work full time in Rangle's office. She had apparently gone into the office a few days earlier for the purpose of bringing the ledgers up to date in preparation for the quarterly visit by Carton. At that time she had filled out a check on Rangle's account in payment of Carton's services for preparing Rangle's will. Temple testified that she returned to full-time work because Carton's bill evidenced that Rangle "was doing what he [had] told [Temple] he was going to do."

On Saturday, April 23, 1983, at the close of office hours, Rangle asked Temple and another employee to witness his will which he then signed in their presence. The trial judge found that the document then signed by Rangle was the Carton Will, a copy of which Rangle had previously signed and delivered to Isaacson. Temple testified that Rangle

---

2. The personal representative at the beginning of the trial waived objection based on the "dead man's statute," Md.Code (1974, 1984 Repl.Vol.), § 9–116 of the Courts and Judicial Proceedings Article.

asked her if she would like to read the document and that she replied "Dr. Rangle, if this is what you told me you were going to do, it is not necessary for me to read it." The trial court found that after Rangle had signed, but before the witnesses had signed, a telephone call from a patient "diverted everyone's attention." Temple testified that Rangle was in a rage because there was an abnormality in the patient's blood tests and Rangle had not been advised of that fact before the patient had telephoned. Rangle gathered up all of his papers and left the office.

Rangle died suddenly on June 27, 1983, leaving no will and no widow. A copy of the Carton Will, undated and unwitnessed, but signed by Rangle, was found in a manila envelope in the trunk of his car. In that envelope were separate sheets containing longhand notes. The trial judge interpreted these notes to involve changes to the Carton Will "so as to leave everything to [Temple] upon her reaching 50 and remaining single, but if that gift fails, the estate is to pass in its entirety to [*Temple's*] direct descendants." The contents of those notes were never communicated to Carton or anyone else before Rangle's death.

Based upon the testimony of witnesses other than Temple and her parents, and based upon "certain actions" of Rangle, the trial judge concluded that he could not find an oral agreement in absolute terms that "if [Temple] would return to work and to him, [Rangle] would make a will leaving his entire estate to [Temple]." The circuit court, however, went on to make the following findings of ultimate fact:

"It is clear, however, that [Rangle] did make an affirmative promise to [Temple], the import of which was that he would provide for her upon his death in a manner fully adequate to make her financially secure. This assurance was necessary to, and did in fact, induce [Temple] to resume her employment and personal relationship with [Rangle]. But for this promise, [Temple] would not have returned to [Rangle] as regards either relationship, vocational or social. [Rangle] never did articulate to [Temple] the manner in which he would make her financially se-

cure, but the minimum manner in which he intended to implement the promise is reflected in the Carton will which he subsequently signed on two separate occasions."

The circuit court further concluded that Rangle's promise to provide for Temple was enforceable despite the statute of frauds because the doctrine of part performance

"was satisfied when [Temple] resumed her employment and social relationship with [Rangle]. Although the value of [Temple's] employment services can be readily ascertained, the value of the personal or social services cannot. And [Temple] would not have resumed one type of service without resuming the other. As to the personal aspects of the relationship, 'it is impossible to restore the parties to their original position.' [*Hanson v. Urner*, 206 Md. 324,] 332[, 111 A.2d 649, 652–53 (1955).] Without [Rangle's] promises, [Temple] would not have fulfilled her part of the bargain by returning to [Rangle]. The resumption of their relationship was incalculable to both parties. Based on these facts, it must be readily concluded that the agreement was fair and reasonable, it was founded on adequate consideration, [Temple] fully complied with her part of the bargain, and it would be so unfair to [Temple] as to be tantamount to a fraud to deny enforcement of the agreement."

The circuit court granted specific performance and imposed a trust on Rangle's estate. The terms of the trust were those found in the original Carton Will.

Both parties appealed. Temple asserted that the circuit court had erred in failing to find and enforce an oral contract to give the entire estate to her. The Court of Special Appeals found there was sufficient evidence to support that aspect of the trial court's findings. Temple has not sought further review in this Court on that aspect of the case.

On the personal representative's appeal the Court of Special Appeals held, *inter alia*, that the trial court was not

clearly erroneous in finding that but for Rangle's promise to make Temple financially secure, Temple *" 'would not have returned to [Rangle] as regards either relationship, vocational or social.' "* 74 Md. App. at 522, 538 A.2d at 1209. The court said that the foregoing finding of fact "clearly establishes the requisite degree of part performance." *Id.* That legal conclusion was predicated on the following rationale:

> "Applying the test set forth in *Hamilton v. Thirston*, 93 Md. 213, 48 A. 709 [ (1901) ], the act ' "would not have been done unless on account of the agreement." ' *Id.* at 219, 48 A. 709 (quoting Lord Hardwicke in *Lacon v. Mertins*, 3 Atk. 4), the trial judge found that Dr. Rangle had agreed to make appellee financially secure if she would return to his employ and social life. [Temple] did indeed resume her employment and personal relationship with Dr. Rangle, making what was for her, under her then circumstances, a most critical decision."

*Id.* at 521, 538 A.2d at 1208.

In his dissent Judge Wenner took a substantially different view of the doctrine of part performance. He would have reversed because Temple's "acts evidence her love and desire to marry Dr. Rangle and might well have been done without the existence of any contract." *Id.* at 533, 538 A.2d at 1214.

Thus, the circuit court and the Court of Special Appeals view the statute of frauds to be inapplicable under the doctrine of part performance where the oral promise induces the conduct relied upon as part performance. On that analysis the law concerning part performance is a matter of causation. Here, causation is clearly a question of fact on which the trial court's conclusion is amply supported. In this Court Temple stands firmly on the legal analysis by the lower courts and submits that we do not sit as a six person and one alternate jury. Judge Wenner, on the other hand, viewed part performance as having an evidentiary component. Under Judge Wenner's theory, the conduct relied

upon as part performance must itself provide evidence of the oral contract.

As explained below, we agree with Judge Wenner. Because of the importance of resolving this substantial difference of opinion on the law of part performance, we do not address other intriguing issues which are raised by the statement of facts and which are or might be embraced within our grant of the personal representative's petition for certiorari.[3]

In stating the reasons for our holding we shall first explain why the statute of frauds and the doctrine of part performance are applicable. Next we shall review that aspect of the doctrine which requires that the part performance relied upon be referable to the oral contract. Our review shall give particular attention to an overstatement of the requirement in the Maryland cases. Finally, we shall show how the conduct relied upon by Temple fails as part performance even under a relaxed statement of the requirement.

(a)

The English Statute of Frauds, 29 Charles II, Ch. 3, § 4 (1677), 2 Alexander's British Statutes 690 (Coe's ed. 1912), was in effect in Maryland until its repeal by Ch. 649 of the Acts of 1971. The "land contracts" clause of § 4 was replaced by a more modernly phrased statute, Md.Code (1974, 1988 Repl.Vol.), § 5–104 of the Real Property Arti-

---

**3.** Consequently, we intimate no opinion on the merits of the following questions involving issues of contract formation and part performance. Can Rangle's admittedly uncertain promise to provide for Temple become a contract by judicially incorporating into it the disposition in the Carton Will, particularly if the terms of that disposition were never communicated to Temple? If Rangle's offer to have Temple read the Carton Will constituted a communication of an offer, was there mutual assent in view of Temple's response which presupposed an outright gift of the entire estate? Is the statute of frauds inapplicable where the trial court's finding of part performance is based on an oral contract which differs substantially from the contract relied upon by the plaintiff?

cle.[4]  Contracts to devise only realty, as well as entire and nonseverable contracts to devise realty and to bequeath personalty, were within the "land contracts" clause of the fourth section of the English statute. *See Hamilton v. Thirston,* 93 Md. 213, 218, 48 A. 709, 710 (1901); 2 A. Corbin, *Corbin on Contracts* § 398 (1950) (Corbin); B. Sparks, *Contracts to Make Wills* 42 (1956) (Sparks). Decisions applying the "land contracts" clause of the English statute are precedents in applying § 5–104. *See Litzenberg v. Litzenberg,* 307 Md. 408, 415, 514 A.2d 476, 479 (1986). Temple does not contend that the oral contract found by the trial court is severable between realty and personalty. Consequently, this case presents a statute of frauds problem.[5]

Of course, if the Carton Will had contained a recital that it was made in compliance with a contract between Rangle and Temple, Rangle's unwitnessed signing of the document could have furnished the memorandum which would satisfy the statute of frauds. Absent any qualifying memorandum, Temple and the courts below looked to part performance, a doctrine developed in equity.

---

**4.** Section 5–104 reads:

   "No action may be brought on any contract for the sale or disposition of land or of any interest in or concerning land unless the contract on which the action is brought, or some memorandum or note of it, is in writing and signed by the party to be charged or some other person lawfully authorized by him."

**5.** In her brief to this Court Temple does not concede that the contract found by the trial court is within the statute of frauds. She argues that the contract was for Rangle to make her "financially secure" and that it was Rangle's unilateral selection of the means, namely, a testamentary trust that included real estate, which led the courts below to conclude that the oral contract was unenforceable but for the part performance doctrine. The limited "contract" suggested by Temple, which is merely an expression of Rangle's testamentary intent, is too indefinite to be a contract and that deficiency was recognized by the circuit court. The circuit court avoided that deficiency when it found that Rangle contracted to leave his entire estate, including realty, in trust for Temple on the terms specified in the Carton Will. The analysis by the trial court achieves definiteness at the expense of a statute of frauds problem.

"By a course of judicial development, the statute has become inapplicable in [part performance] cases, in spite of the fact that they are clearly included within its words. Part performance of a contract for the transfer of land does not take the case out of the statute; but it may be of such a character that it will take the statute out of the case."

Corbin, § 420, at 452 (footnote omitted). "[T]he authorities are clear that the doctrine of part performance is peculiar to chancery and is not regarded at law to take a case out of the statute." *Hamilton v. Thirston*, 93 Md. 213, 219, 48 A. 709, 711 (1901). Unless the facts relied upon by Temple presented a case for equitable relief, she would have no basis to argue part performance and no remedy on the oral contract.

Whether the breach of the contract in this case gives rise to equitable relief is not clear-cut. Rangle's promise to provide for Temple's financial security by a testamentary trust as set forth in the Carton Will, in consideration for Temple's promise to resume employment and the couple's social relationship, is a contract for personal services. Temple's promise has been fully executed. *Cf. Fitzpatrick v. Michael*, 177 Md. 248, 9 A.2d 639 (1939) (executory contract to render personal services as nurse, chauffeur, companion, gardener and housekeeper not specifically enforceable under the general rule by either party). But Temple's services in the medical office were adequately compensated and she disclaimed any expectation of compensation for the social relationship.[6] Under these circumstances it is unclear that the personal service factors alone would warrant the exercise of equitable powers. The lower courts also emphasized Temple's change of position in resuming both relationships, a change found by the circuit court to have been induced by Rangle's promises. When she learned of the

---

**6.** There is not a suggestion in this case that the social relationship was meretricious. Counsel for Temple have also deliberately steered wide of any "palimony" theory.

breach, it was too late to reverse the decision she had made. We shall assume that this estoppel aspect of the case satisfies historic equity jurisdiction and that the case is one in which we may consider whether part performance avoids the statute of frauds defense. Both lower courts also utilized Temple's resumption of her antecedent relationships with Rangle as the conduct which constituted part performance, in the belief that Rangle's inducement made that conduct part performance. In so holding, those courts misinterpreted our cases.

### (b)

"[P]art performance will not make an oral contract enforceable unless it is such as to be directly 'referable' to that contract. There is so much variation in the ordinary wordings of this requirement that it cannot be reduced to any very definite form; it must be explained rather than stated. The phrase 'referable to the contract' frequently appears; but nobody gives any exact meaning to 'referable.'

. . . .

"It is believed that the principal idea that is struggling for expression is that the part performance must be clearly evidential of the existence of a contract—it must be such as would not ordinarily have taken place in the absence of a contract and therefore is not reasonably explicable on some other ground."

Corbin, § 430, at 473 (footnotes omitted).

Our most recent application of this requirement was in *Beall v. Beall*, 291 Md. 224, 434 A.2d 1015 (1981) which involved the partly written and allegedly partly oral extension of an option to purchase realty. The subject of the option was a residence which was surrounded on three sides by a farm. For a share of the profits, the optionor had worked the farm for his parents from 1956 until 1968 when the optionee purchased the farm. Thereafter the optionor continued to work the farm for the optionee. Under their arrangement the optionor paid the taxes and all expenses

incident to farming. The option on the residence was given in 1971, to remain open until 1976. The optionee contended that the option had been extended in 1975, to remain open until 1979, but the memorandum of that extension did not reflect any consideration for the extension. The optionee argued that the consideration was his parol promise to forbear exercising the unextended 1971 option. He contended that this act of forbearance was also part performance so that the statute of frauds did not apply. We held that part performance had not been sufficiently established because it was uncertain to what the optionee's forbearance in fact related. We said that

> "[i]t is not certain ... that [the optionee's] election to postpone acceptance of the offer was an act which he would not have done in the absence of [optionor's] extension of the offer to sell [the] land. As a matter of fact it is clearly explainable on the ground that [the optionee] wished [the optionor] to continue working the farm without regard to [the optionee's] interest in purchasing the subject property."

*Id.* at 232, 434 A.2d at 1020. In support of that analysis we quoted *Semmes v. Worthington,* 38 Md. 298, 326–27 (1873) for the proposition that "the part performance itself 'must furnish evidence of the identity of the contract; and it is not enough that it is evidence of *some* agreement, but it must relate to and be unequivocal evidence of the *particular* agreement....' " 291 Md. at 230, 434 A.2d at 1019.[7]

*Semmes* is not reconcilable with Temple's view of the part performance doctrine. In that case a nephew had been working from the fall of 1866 to April 1869, as tenant on a 1200 acre farm, for its owner, his uncle. They had a falling out, the nephew left and the uncle engaged a new tenant who was unsatisfactory. The uncle then sent two separate

---

7. The emphasis on the distinction between "some" and "particular" was supplied by the Court in *Beall.* In Stockett's original report of Judge Alvey's opinion for the Court in *Semmes,* and in Perkins's edition, the entire predicate is italicized, *i.e., "must relate to and be unequivocal evidence of the particular agreement charged in the bill."*

emissaries to the nephew to convey a proposition to get the nephew to return. One emissary testified that the uncle told him " 'to tell [the nephew] that if he wouldn't come back and attend to his work like he did before, he shouldn't have a damned cent, and if he would come back he would give him the place.' " 38 Md. at 321. Testimony of the other emissary was to the same effect. The nephew did return and worked the farm until the uncle's death in March 1870. The uncle's last will made no provision for the nephew. The trial court enforced the oral agreement but this Court reversed. Inasmuch as the nephew could not testify under the dead man's statute, the trial court's factual finding of an oral agreement necessarily was predicated on the testimony of the emissaries under which the promise clearly induced the nephew to return. The *Semmes* court concluded that the acts of part performance relied upon, namely, possession by the nephew, were "wholly insufficient." *Id.* at 326. "[T]he partial and subordinate possession that was held by the plaintiff, under the peculiar circumstances of the case, was, to make the most of it, an equivocal act, susceptible of a variety of interpretations, and affording no evidence or presumption whatever of the particular contract alleged...." *Id.* If, as Temple contends, the requirement whereby part performance must "relate to" the oral contract is satisfied by a fact-finding that the oral promise induced the conduct, then *Semmes* could not have concluded that that requirement was not fulfilled.

The "peculiar circumstances" of *Semmes* are more particularly described in the argument of counsel who obtained the reversal.

"It is undeniable in the present case, that the complainant on his return to the farm became tenant again upon the same terms as before; that he occupied and cultivated the farm as tenant—paid rent as tenant. That relation determined in all respects the character of his occupation. Whether the alleged agreement existed or did not exist, makes no visible difference. His occupation was of pre-

cisely the same nature before he quitted the farm that it
was after his return to it. He held before in accordance
with the terms expressed in the old written lease.... He
holds it subsequently, and down to, and after his uncle's
death upon the same conditions, and governed by the
same ... lease. During the previous period no agree-
ment to devise existed, as [the nephew] acknowledges.
How then *can* that occupation be considered as necessar-
ily referable to the agreement in question?"
*Id.* at 309.

Temple, in support of her position that there is part
performance because the resumption of her relationship
with Rangle was motivated by his oral promise, cites no
authority other than the analysis by the Court of Special
Appeals. That analysis cited *Hamilton v. Thirston*, 93 Md.
213, 48 A. 709 (1901), not for its holding, but for language
included in the opinion. *Hamilton* was an action at law
brought by a nephew against the personal representative of
his uncle's estate. The nephew sued on an express oral
contract, alleging that the uncle promised to leave to the
nephew a child's share of the uncle's estate in consideration
for services to be rendered by the nephew for the uncle for
the balance of the uncle's life. Verdict and judgment were
for the nephew in the trial court but this Court reversed
because the contract was within the statute of frauds and
part performance does not apply at law. This Court further
commented that, had the proceeding been in equity, "it is
extremely doubtful whether the evidence as to part per-
formance appearing in the record would measure up to the
standards set by the authorities." *Id.* at 219, 48 A. at 711.
We then quoted a sentence from *Lacon v. Mertins*, 3 Atk.
1, 4 (1743) "that the act relied on as part performance 'Must
be such an act done as appears to the Court would not have
been done unless on account of the agreement[.]' " 93 Md.
at 219, 48 A. at 711. It is clear that this Court in *Hamilton*
did not interpret the quote from *Lacon* to mean that a
factual finding that the plaintiff was motivated by the oral
contract, in and of itself, sufficed as part performance.

Immediately following the quote from *Lacon, Hamilton* stated:

> "[T]his Court has repeatedly said that such acts must be clear and definite and *refer exclusively to the alleged agreement....* The services appearing by the record to have been rendered by the [nephew] although considerable in amount and covering a period of some years were such as might well have been rendered by a nephew to an aged uncle without the existence of any contract in reference to them."

*Id.* (citations omitted). We remanded the action to the law side of the circuit court to permit the nephew to claim for the services in *quantum meruit.*

Nor do the facts in *Lacon* support the interpretation which the Court of Special Appeals places on the phrase "unless on account of the agreement." 3 Atk. at 4. Indeed, the quoted phrase is probably dicta in *Lacon.* The case involved an oral agreement between a debtor and a lender under which the latter would refinance the mortgage on one of the debtor's properties. Before any loan documents were executed, but after the lender had advanced part of the promised loan proceeds, the debtor died. An unsecured creditor obtained letters of administration on the debtor's estate and sued to enforce the agreement to refinance. The lender admitted the oral agreement and asked only that the principal amount of the refinancing be reduced by the amounts which the lender had advanced.

The written opinion of the circuit judge in the instant case relied principally on *Hanson v. Urner,* 206 Md. 324, 111 A.2d 649 (1955) for the conclusion that but-for causation was alone sufficient as part performance. No argument was made in *Hanson* that the plaintiff's conduct did not sufficiently evidence the alleged oral agreement. There an elderly woman promised to make a will devising a specific piece of improved commercial property, known as the Potomac Edison Building, as well as a diamond ring, in consider-

ation for housekeeping and nursing services to be rendered for the balance of her life by the plaintiff, her son's former wife. The plaintiff left her home in Baltimore to live in her former mother-in-law's Hagerstown home where the plaintiff cared for the woman for three and one-half years, apparently without compensation other than that which had been orally promised. The circuit court concluded that the evidence which had cleared the hurdle of the dead man's statute did not establish that the offer had been communicated to the plaintiff, and dismissed the complaint. This Court reversed. Of significance to the instant case is the statement in *Hanson* that "[t]he rendition of the services by complainant cannot be reasonably accounted for except on the theory of a promise by the testatrix and reliance thereon by complainant, who left her apartment in Baltimore to undertake arduous work in Hagerstown for a suffering woman to whom she was not related." *Id.* at 335, 111 A.2d at 654.

*Hanson* does illustrate that the language used in some of this Court's early opinions to express the evidentiary component of the part performance doctrine is not to be applied in an absolutely literal fashion. It is an overstatement to say, as did *Semmes v. Worthington*, 38 Md. 298, 327 (1873), that "it is not enough that [the conduct relied upon for part performance] is evidence of some agreement, but it *must relate to and be unequivocal evidence of the particular agreement charged in the bill.*" And *see Chesapeake & Ohio Canal Co. v. Young*, 3 Md. 480, 490 (1853) where the statement is repeated from Chancellor Kent's opinion in *Phillips v. Thompson*, 1 Johns. Ch. 131, 148 (N.Y. Ch. 1814). Pomeroy has, with justification, criticized the *Phillips* line of cases.

"It is important here to obtain an accurate notion concerning the facts which the acts of part performance must show to exist, in order that they may be a sufficient ground for the interference of equity, especially as there

are misleading dicta and even erroneous decisions upon this particular point. In a suit to enforce the specific performance of a verbal contract embraced within the statute of frauds, two distinct facts are established by parol evidence—the acts of part performance, and the terms of the agreement itself. According to the theory upon which equity proceeds, in such cases, the part performance must be first proved, in order to fulfill the condition precedent for letting in parol evidence of the agreement; and this is not a mere question of the order of proofs—it involves the very principle of the jurisdiction. As soon as a sufficient part performance is made out, the plaintiff may go on and show the terms of the verbal contract. There are, therefore, two distinct branches of parol evidence, with a distinct fact to be established by each, but proceeding in a fixed order of time, and of antecedent and consequent; not, however, exactly in the order of cause and effect. Now, the question before us is, What must be proved by the first branch of this parol evidence, in order to open the way for the second? In the vast majority of cases the evidence establishing the part performance, and the acts of part performance themselves, when established, do not and, in the nature of things, cannot fully show what are the terms of the agreement alleged and relied upon by the plaintiff, nor are they introduced for any such purpose. The judicial opinions which, in unguarded and careless language, would require the acts of part performance to prove the exact contract as alleged, are in this respect clearly erroneous. The true rule is, that the acts of part performance must be such as show that some contract exists between the parties; that they were done in pursuance thereof, and that it is not inconsistent with the one alleged in the pleading."

J. Pomeroy, *Specific Performance of Contracts* § 107 (3d ed. 1926) (Pomeroy). *See also* C. Browne, *Statute of Frauds* §§ 455–56 (4th ed. 1880) (The acts of part perform-

ance relied upon "must ultimately appear to have been done in pursuance of the contract sought to be enforced" and "are not put in evidence to prove what that contract is...." *Id.* at 525.).

■ In a footnote to the foregoing discussion Pomeroy opines that the "correct rule ... is admirably stated" in *Dale v. Hamilton,* 5 Ha. 369, 381 (1846):

> " 'It is generally of the essence of such an act (of part performance) that the court shall, by reason of the act itself, without knowing whether there was an agreement or not, find the parties unequivocally in a position different from that which, according to their legal rights, they would be in if there were no contract.' "

Pomeroy, at 259 n. 2.

The quotation from *Dale* more accurately encapsulates the rule actually applied in the more recent part performance cases of this Court than does the statement in *Semmes.*

We have allowed the plaintiff to prove the particular terms of an oral contract to make a will where acts of part performance have sufficiently evidenced that services rendered were to be compensated by a transfer of property at the promisor's death. These cases have happened to arise out of circumstances similar to those in *Hanson. See Shives v. Borgman,* 194 Md. 29, 69 A.2d 802 (1949) (plaintiff, accompanied by her husband who gave up his job, left Cumberland to nurse an amputee in his Hagerstown home, without pay, until the amputee's death seventeen months later); *Nichols v. Reed,* 186 Md. 317, 46 A.2d 695 (1946) (foster son and his wife leave their home and wife leaves her job in order to nurse foster father in his home, without pay); *Mannix v. Baumgardner,* 184 Md. 600, 42 A.2d 124 (1945) (plaintiff and her husband leave their home at husband's parents' residence after death of plaintiff's mother in order to nurse at his home plaintiff's stepfather who was a

drunk and a gambler); *Neal v. Hamilton,* 159 Md. 447, 150 A. 867 (1930) (plaintiff leaves waitress job in New Jersey, paying $35 to $55 per week, and her home at her sister's residence, where plaintiff paid $20 per week board, to nurse an elderly man in Baltimore for $12 per week wages).

(c)

■ When we apply the foregoing principles to the instant matter, Temple's conduct fails to constitute part performance. If we look exclusively at the conduct, without the aid of testimony describing the oral contract, there is nothing which indicates that Temple's return to employment in the medical office and resumption of her social relationship with Rangle was only referable to a promise by Rangle to favor Temple in his will. The resumption of their relationship is objectively explainable as two divorced persons who are very fond of each other, who have had a disagreement and who have made up. That explanation is completely consistent with the history of their relationship. Nothing other than testimony describing an oral agreement distinguishes the reconciliation of October 1982 from the reconciliation in 1981. In this respect the instant case is not substantially different from the nephew's return to his uncle's farm in *Semmes. See also Maddison v. Alderson,* 8 App. Cas. 467 (1883) (housekeeper's return to service of master at manor house, allegedly because of oral promise to devise realty, was not sufficient evidence of part performance).

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND TO REMAND THIS CASE TO THE CIRCUIT COURT FOR BALTIMORE CITY WITH INSTRUCTIONS TO ENTER A JUDGMENT DISMISSING THE COMPLAINT. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY JANET M. TEMPLE.