613 A.2d 1033

Jean E. LaROQUE

v.

Thomas G. LaHOOD, Personal Representative of the Estate of Thomas J. LaRoque, Sr.

No. 6, Sept. Term, 1992.

Court of Special Appeals of Maryland.

Oct. 7, 1992.

Eugene E. Pitrof, Upper Marlboro (Pitrof & Starkey, Upper Marlboro, and Sandra R. Bullington, Indian Head, on the brief), for appellant.

Thomas G. LaHood, Waldorf, for appellee.

Argued before MOYLAN, ALPERT and MOTZ, JJ.

ALPERT, Judge.

Thomas Joseph "Joe" LaRoque, Sr., died on April 13, 1990. His widow Jean contends that before Joe died the

couple had orally agreed to transfer all of their individually held real property to each other as tenants by the entirety. There are two primary issues on appeal: (1) whether Jean's unilateral conveyance of two farms *from* her name individually *to* the couple as tenants by the entirety constituted part performance sufficient to take the alleged oral agreement out of the Statute of Frauds, and (2) with respect to a certain business enterprise managed by the couple, whether the evidence presented established that this business was a partnership between Jean and Joe.

## BACKGROUND

Appellant Jean E. LaRoque ["Jean"] is the widow of the late Thomas Joseph LaRoque, Sr., ["Joe",] her second husband, whom she married on September 8, 1988. Joe was killed by a cow on April 13, 1990. Upon Joe's death, Thomas G. LaHood, Esq., was appointed Special Administrator of Joe's estate, and was subsequently named as the Personal Representative of the estate. It is in the capacity of Personal Representative that Mr. LaHood acts as the appellee herein. The background leading up to this litigation may be summarized as follows:

Jean married her first husband, the late Thomas Wedding, in August of 1969. Together they ran a country store in Newburg, in Charles County, Maryland. In the course of their fourteen-and-one-half years of marriage, Jean bore Mr. Wedding two children: Kevin, who was 28 at the time of trial, and Chris, who was 21. Mr. Wedding died on February 13, 1984, thereby leaving Jean with (as is relevant here) sole title to two pieces of real property: (1) "Oak Grove Farm," which Mr. Wedding and Jean had purchased as tenants by the entirety in February, 1982, from Mr. Wedding's grandmother, and (2) "Locust Grove Farm," which Mr. Wedding had acquired prior to marrying Jean,

but which he devised to Jean solely in his will.[1]

Jean had known Joe casually since 1974. After the death of Mr. Wedding, Jean and Joe renewed their friendship. They began dating in the spring of 1984.

Prior to the time that Jean and Joe had begun dating, Joe had been working to open a new and used truck sales, parts and repair business. To that end, on May 6, 1983 Joe acquired three parcels of land, comprising approximately 4.781 acres, in Charles County, Maryland. Within a few months thereafter, Joe commenced construction of a large commercial building on part of that land. On August 23, 1983, he opened a commercial bank account in the name of "Newburg Truck Parts and Equipment," of which account Joe was sole owner.

By September, 1985, Jean and Joe had moved in together. About this time Joe was ready to open his business—which would become known as Newburg Super Truck Parts ["the business"]—but funds for inventory were lacking. Seeking to assist Joe in getting the business off the ground, on September 10, 1985 Jean "put in" $100,000 of her personal funds by depositing same in the business's commercial bank account. No promissory note was given for her "contribution."

The business opened its doors on September 16, 1985; in front of the business the couple had hung a neon sign reading "J & J," which stood for "Joe and Jean." By September, 1986, Jean's name had been put on Joe's personal bank account; by January 15, 1987, Jean had became a joint owner of the commercial bank account as well.

On September 8, 1988, Joe and Jean married. As indicated above, Jean brought to the marriage two substantial pieces of realty titled in her name only, Locust Grove Farm and Oak Grove Farm. In addition to owning the land on

---

1. It was stipulated by the parties prior to trial that the appraised value of Locust Grove Farm was $167,400, and that the appraised value of Oak Grove Farm was $266,500.

which the business operated, Joe also brought to the marriage several other pieces of realty titled in his name only: on January 3, 1977, he had acquired two lots in a subdivision known as "Woodland Point," in Charles County, Maryland; and on April 17, 1980, Joe had purchased an additional four lots, totalling approximately 3.34 acres, these lots being located in Prince George's County, Maryland.

During the time that Jean and Joe were married, and during all times relevant to this litigation, both parties worked at and for the business, though neither derived any financial compensation therefrom. Testimony indicated that the parties jointly managed the office and maintained the books and accounts of that business.

During the spring of 1989, Joe and Jean sought to increase the equity in Newburg Super Truck Parts [2]. Correspondingly, on May 26, 1989, Jean "put in" an additional $30,000 to the business by depositing those funds into the business's commercial bank account.

On or about September 8, 1989, the couple went to a restaurant to celebrate their first wedding anniversary. What the couple discussed at that restaurant raises one of the two primary issues in the case *sub judice*. Jean contends that she and Joe agreed to title all of their property—including (as is relevant here) each parcel of their respective real property—as a tenancy by the entirety. (Mr. LaHood, as personal representative of Joe's estate and appellee herein, contends that such an agreement, if it occurred at all, is barred by the Statute of Frauds.)

Nevertheless, and the couple's alleged agreement notwithstanding, on or about December 21, 1989 Jean executed with Joe a deed, which deed conveyed Jean's two farms *from* Jean as sole title holder *to* Jean and Joe as tenants by

---

**2.** About this time Joe and Jean also purchased a herd of cows and bulls, the title to which was subsequently disputed between the parties hereto. This dispute was resolved by the trial court, and thus we shall not discuss it further herein.

the entirety. The granting clause of this deed reads as follows:

NOW, THEREFORE, THIS DEED WITNESSETH: That for no monetary consideration and in consideration of the love and affection held for her husband, the Grantor, Jean E. LaRoque, formerly Jean E. Wedding, does hereby grant and convey to and unto Jean E. La-Roque and Thomas J. LaRoque, as tenants-by-the-entireties ... [fee simple title to Locust Grove Farm and Oak Grove Farm].

In early 1990 the couple filed a joint 1989 federal tax return. Attached to this tax return was a form designated by the Department of the Treasury as the so-called "Schedule C." Schedule C is captioned "Profit or Loss From Business (Sole Proprietorship); Partnerships, Joint Ventures, Etc. Must File Form 1065." On the top of the form Joe, as an individual, is listed as the sole proprietor of Newburg Super Truck Parts.

And on April 13, 1990, Joe—never having correspondingly retitled any of *his* real property into a tenancy by the entirety—was killed by a cow.

On January 11, 1991, Jean filed suit in the circuit court for Charles County against Mr. LaHood (the appellee herein, as aforementioned) in which Jean sought (as is relevant here) (1) to have the circuit court declare that Jean and Joe had an enforceable agreement; she also prayed that the court should specifically enforce same, and (2) to have the circuit court declare that Newburg Super Truck Parts was a family partnership.

Following an evidentiary hearing, the circuit court (Bowling, J.), *inter alia* and pursuant to an Order for Judgment dated September 16, 1991, (1) denied Jean's complaint for a declaratory judgment that the parties had an enforceable agreement, (2) denied Jean's complaint for specific performance regarding the alleged agreement, and (3) denied Jean's complaint for a declaratory judgment that Newburg Super Truck Parts was a family partnership.

Following a timely appeal by Jean, we are now asked to resolve two basic questions:

I.  Whether the deed to Locust Grove Farm and Oak Grove Farm *from* Jean as sole title holder *to* Jean and Joe as tenants by the entirety, which deed states that Jean's consideration for the transfer of title is her love and affection for Joe, constitutes part performance of the alleged oral contract between them (sufficient to take the alleged oral agreement out of the Statute of Frauds), which contract called for each of them to transfer individually titled real property to both of them as tenants by the entirety?

and

II.  Based upon the evidence presented, whether the trial court erred in finding that Joe and Jean were not partners in a family business?

We respond to each question in the negative, and therefore we shall affirm the trial court.

## THE LAW

### A.

■ Jean contends that she and Joe had agreed to retitle all of their individually held real property as tenancies by the entirety. Jean further contends that, pursuant to and in reliance on that agreement, she proceeded to convey Locust Grove Farm and Oak Grove Farm to she and Joe as tenants by the entirety. Mr. Lahood, as appellee herein, argues that the alleged oral contract is within the Statute of Frauds, and is therefore unenforceable. Jean counters that her actions in so conveying her farms constitute part performance, thus rendering the oral contract enforceable by removing it from the Statute of Frauds.

While Jean and Mr. LaHood disagree as to its application, both parties agree that *Unitas v. Temple*, 314 Md. 689, 552 A.2d 1285 (1989) is the dispositive precedent. We agree that *Unitas* is indeed dispositive of this Statute of Frauds issue.

The facts in *Unitas* may be briefly summarized as follows. In 1968, Dr. Raymond Rangle began dating Janet Temple, a woman who worked for him. Despite an abiding love for one another and a relationship which lasted over fourteen years, the couple never married, a fact which caused much distress to Ms. Temple. Several times during those fourteen years Ms. Temple became sufficiently frustrated at Dr. Rangle's successful attempts at avoiding marriage, and, correspondingly, several times she broke off their relationship. Each time she subsequently returned to him. The Court of Appeals noted,

> [Temple's] concern over her status with [Rangle] became pronounced in March, 1982 because she had then reached her fortieth birthday and was still not married. This concern reached its zenith on 9/27/82 when [Temple] told [Rangle] in her most emphatic terms thus far that, since [Rangle] had not yet made any provisions for [Temple's] future despite his past promises and since she was already 40 years old, she was leaving [Rangle] for good. For the next few nights, [Rangle] came to [Temple's] house and tried to assure [Temple] and her parents that her fears were unfounded and that [Temple] didn't have to worry about her pension or future financial security.

*Unitas, id.* at 694–95, 552 A.2d 1285 (quoting trial court). In addition, Temple and her parents testified that Rangle stated in unequivocal terms that if Temple would return to work and resume the couple's social relationship, Rangle would make a will leaving his entire estate to Temple. *Id.* at 695, 552 A.2d 1285.

Indeed, Temple subsequently returned to Rangle, stating that she did so because she loved him, she knew that he needed her, and because he said that he was getting his affairs in order preliminary to marriage. And, consistent with his alleged promises, Dr. Rangle signed—although improperly executed—a "will," which essentially provided income to Temple for life. Dr. Rangle also ordered the preparation of certain pre-nuptial documents, which conditionally gave his entire estate to Temple; once prepared,

however, these documents were never signed by Dr. Rangle. Thus, when Dr. Rangle suddenly died shortly thereafter, he left no proper writing that provided any money for Temple. Temple, wanting her fair share of Dr. Rangle's estate, sued.

The circuit court, having considered all the facts set forth above, granted specific performance of the "will," thereby providing income to Temple for life. Both parties appealed—Temple, because she didn't get Rangle's entire estate, and Rangle's Personal Representative ["Unitas"], because Temple had gotten anything at all. The Court of Special Appeals affirmed, holding, *inter alia*, that

> the trial court was not clearly erroneous in finding that but for Rangle's promise to make Temple financially secure, Temple *"'would not have returned to [Rangle] as regards either relationship, vocational or social.'"* 74 Md.App. [506] at 522, 538 A.2d [1201] at 1209. The court said that the foregoing finding of fact "clearly establishes the requisite degree of part performance." *Id.*

*Unitas*, 314 Md. at 697–98, 552 A.2d 1285 (emphasis in original). The Court of Special Appeals predicated its legal conclusion on the holding in *Hamilton v. Thirston*, 93 Md. 213, 48 A. 709 (1901), to wit:

> Applying the test set forth in *Hamilton* . . ., the [alleged act of part performance] ' "would not have been done unless on account of the [parties'] agreement." ' . . . [T]he trial judge found that Dr. Rangle had agreed to make [Temple] financially secure if she would return to his employ and social life. [Temple] did indeed resume her employment and personal relationship with Dr. Rangle, making what was for her, under her then circumstances, a most critical decision.

*Unitas*, 314 Md. at 698, 552 A.2d 1285 (quoting *Unitas*, 74 Md.App. at 521, 538 A.2d 1201) (citation omitted here). Judge Wenner dissented from the majority's holding. Rather than affirm the trial court, he would have reversed because Temple's "acts evidence her love and desire to

marry Dr. Rangle and might well have been done without the existence of any contract." *Unitas,* 314 Md. at 698, 552 A.2d 1285 (quoting *Unitas,* 74 Md.App. at 533, 538 A.2d 1201).

Unitas (as Personal Representative of Rangle's estate), having lost at the Court of Special Appeals, then proceeded to the Court of Appeals. The issue that court was asked to decide was therefore simple, yet subtle: What is the nature of the part performance sufficient to remove an oral agreement from the Statutes of Frauds? Was it (as Temple asserted, and as the Court of Special Appeals had held) in the nature of *causation,* i.e., an oral contract is removed from the Statute of Frauds if the alleged contract *causes* the part performance? Or was it (as Unitas asserted, and as Judge Wenner maintained) in the nature of possessing an evidentiary component, i.e., an oral contract is removed from the Statute of Frauds if the alleged contract is *evidenced* by the part performance?

Therefore, with respect to the doctrine of part performance, the subtle distinction between the "causation" theory (i.e., the majority's holding) and the "evidentiary" theory (i.e., Judge Wenner's theory) may perhaps be summarized as follows: the *causation* theory focuses on the effect of the contract upon the one who partially performs; the *evidentiary* theory focuses upon the nature of the performance itself and whether such performance necessarily and unequivocally evidences the existence of an agreement.

The Court of Appeals, in reversing the Court of Special Appeals, adopted the "evidentiary theory" advanced by Judge Wenner:

 It is generally of the essence of such an act (of part performance) that the court shall, *by reason of the act itself,* without knowing whether there was an agreement or not, find the parties unequivocally in a position different from that which, according to their legal rights, they would be in if there were no contract.

*Unitas,* 314 Md. at 709, 552 A.2d 1285 (quoting *Dale v. Hamilton,* 5 Ha. 369, 381 (1846), as reported in J. Pomeroy, *Specific Performance of Contracts* § 107 (3rd ed. 1926) at 259 n. 2 ("Pomeroy")) (emphasis added here). In so holding, the Court of Appeals quoted at length from Pomeroy. We find Pomeroy's explanation instructive:

> In a suit to enforce the specific performance of a verbal contract embraced within the statute of frauds, two distinct facts are established by parol evidence—the acts of part performance, and the terms of the agreement itself. According to the theory upon which equity proceeds, in such cases, the part performance must be first proved, in order to fulfill the condition precedent for letting in parol evidence of the agreement; and this is not a mere question of the order of proofs—it involves the very principle of the jurisdiction. As soon as a sufficient part performance is made out, the plaintiff may go on and show the terms of the verbal contract. There are, therefore, two distinct branches of parol evidence, with a distinct fact to be established by each, but proceeding in a fixed order of time, and of antecedent and consequent; not, however, exactly in the order of cause and effect. Now, the question before us is, What must be proved by the first branch of this parol evidence, in order to open the way for the second? In the vast majority of cases the evidence establishing the part performance, and the acts of part performance themselves, when established, do not and, in the nature of things, cannot fully show what are the terms of the agreement alleged and relied upon by the plaintiff, nor are they introduced for any such purpose. The judicial opinions which, in unguarded and careless language, would require the acts of part performance to prove the exact contract as alleged, are in this respect clearly erroneous. *The true rule is, that the acts of part performance must be such as to show that some contract exists between the parties; that they were done in pursuance thereof, and that it is not inconsistent with the one alleged in the pleading.*

*Unitas,* 314 Md. at 708, 552 A.2d 1285 (quoting Pomeroy at § 107) (emphasis added here).

In so resolving the partial performance issue in *Unitas,* the Court of Appeals then went on to apply the standard that, in turn, shall be dispositive of the case *sub judice:*

> *If we look exclusively at the conduct, without the aid of testimony describing the oral contract,* there is nothing which indicates that Temple's return to employment in the medical office and resumption of her social relationship with Rangle was only referable to a promise by Rangle to favor Temple in his will. The resumption of their relationship is objectively explainable as two divorced persons who are very fond of each other, who have had a disagreement and who have made up. That explanation is completely consistent with the history of their relationship.

*Id.* at 710, 552 A.2d 1285 (emphasis added).

Therefore the present issue before us is, when we look *exclusively* at the conduct that Jean alleges to be part performance, *without the aid of testimony describing the alleged oral contract,* whether there is anything that indicates that Jean's conveyance of her two farms was referable *only* to the alleged promise by Joe to title all of his realty as tenancies by the entirety.

The primary conduct that Jean alleges to be part performance is her execution of the deed which created in her and Joe a tenancy by the entirety in those properties. The granting clause of this deed reads as follows:

> **NOW, THEREFORE, THIS DEED WITNESSETH:** That for no monetary consideration and in consideration of the love and affection held for her husband, the Grantor, Jean E. LaRoque, formerly Jean E. Wedding, does hereby grant and convey to and unto Jean E. LaRoque and Thomas J. LaRoque, as tenants-by-the-entireties ... [fee simple title to Locust Grove Farm and Oak Grove Farm].

We hold that such a conveyance of land is objectively explainable as that of a married person who, simply because she loves and has affection for her spouse, conveys the object property to herself and her spouse as tenants by the entirety. Such an explanation is completely consistent with the facts as set forth by the parties. Therefore, Jean's alleged part performance is not such that it *necessarily and unequivocally* shows that some contract existed between the parties.

In misapplying the Court of Appeals' holding in *Unitas*, Jean raises four subissues in defense of her claim: (1) The lower court erred in requiring that Jean's conduct prove the exact contract as alleged, (2) in order to make an objective conclusion, the lower court erred by failing to consider the facts and circumstances of Jean's case, (3) that Jean's alleged part performance consisted of her seeking counsel from her husband's attorney *and* conveying her farms into a tenancy by the entirety (as opposed to just the latter), and (4) the trial court erred by refusing to admit the testimony of the deed scrivener. We shall deal with these issues respectively.

1.

First, Jean alleges that the lower court erred in requiring that Jean's conduct prove the exact contract as alleged, rather than simply requiring her to prove that such conduct is referable to *a* contract in general. Jean primarily bases this argument on language that the trial court used in denying her claim, to wit:

> I think that as I understand, indicated in the *Unitas* case that you have to view the totality of the circumstances and if [the conduct alleged to be part performance] is subject to two interpretations then I think that opinion clearly states that you cannot conclude that that [is] part performance.

Indeed, as Jean suggests, this language incorrectly states the standard set forth in *Unitas;* however, under the cir-

cumstances set forth in the case *sub judice,* such a mistake simply constitutes harmless error.

The issue concerning part performance is not *how many* interpretations the conduct (i.e., the alleged part performance) is subject to, but rather, what the *nature* is of those interpretations. It may be possible, for example, for a certain part performance to be subject to, say, *seventy-five* different interpretations as to why the party so acting did what he or she did; however, if those seventy-five different interpretations necessarily and unequivocally suggest that the alleged part performance is referable to the existence of a contract, then such part performance—*irrespective of the number of interpretations and/or explanations underlying same*—is sufficient to remove the oral contract from the reach of the Statute of Frauds.

In the present case, the issue is not the number of reasonable or available interpretations as to Jean's motivation for conveying her farms as tenancies by the entirety, but rather, whether the part performance itself necessarily and unequivocally shows the existence of a contract. As explained above, we believe that Jean's conduct does not *of itself* necessarily and unequivocally demonstrate the existence of an underlying contract. Therefore, although the trial judge may have misstated the standard, the facts nevertheless support his conclusion.

### 2.

Second, Jean alleges that the trial court did not consider adequately all of the facts and circumstances of Jean's case.[3] To support this contention, Jean, in her brief before this court, suggests that the *Unitas* case

> showed that a court cannot isolate the act of part performance and examine it in a sterile vacuum. In *Unitas* the Court of Appeals reviewed the history of Dr. Rangle's

---

3. For example, Jean argues that the trial court did not consider adequately the aggregate value of the two farms, or the amount of allegedly uncontroverted testimony in support of her position.

and Ms. Temple's relationship. *It was only because of* this examination of all of the facts and circumstances of Dr. Rangle's and Ms. Temple's relationship that the Court could conclude, "The resumption of their relationship is objectively explainable as two divorced persons who are very fond of each other, who have had a disagreement and who have made up[.]"

Admittedly, the trial court in *Unitas* conducted a fairly extensive factual examination prior to holding that Ms. Temple's acts constituted part performance sufficient to remove the couple's alleged oral agreement from the Statute of Frauds; and admittedly, the Court of Appeals examined all of these facts and circumstances prior to reversing the lower court and concluding that the resumption of the couple's relationship was objectively explainable on grounds other than the alleged part performance.

Jean, however, has misconstrued the use to which the Court of Appeals put those facts and circumstances. For the sole purpose of explaining this misconstruction, we may therefore establish a sort of trilogy: As more fully discussed above, the court may, and under appropriate circumstances indeed should, establish by parol evidence (1) the acts of part performance, and (2) the terms of the agreement itself. *See Unitas*, 314 Md. at 708, 552 A.2d 1285 (quoting Pomeroy at § 107). Many of the facts presented in the case *sub judice* fit nicely and cleanly into one or both of those two categories.

Further, as implicitly indicated by Jean in her brief before this court, there is a third category of evidence that the trial court is permitted to consider, that is, the court may consider evidence concerning the alternative grounds on which the alleged part performance is objectively explainable. This third category, it should be noted, does not assist the one asserting part performance; rather, it assists the one alleging that there was *no* part performance. In *Unitas*, for example, the trial court properly considered evidence concerning the couple's prior relationship—*not* for the purpose of justifying or explaining why Ms. Temple returned to Dr.

Rangle (i.e., the alleged part performance), but for the exact opposite purpose of presenting a reasonable alternative hypothesis on which the alleged part performance is objectively explainable (i.e., the couple had separated and reunited previously).

In contrast, a trial court *cannot* permissibly employ parol evidence to justify and explain the acts of the alleged part performance itself; indeed, as we discussed above, the alleged acts themselves—*standing on their own*—must be such as to show that some contract exists between the parties. *Unitas, id.* at 708, 552 A.2d 1285 (quoting Pomeroy at § 107).

We believe that Jean misconstrued how the Court of Appeals employed the facts and circumstances of that case. We now hold that the trial court in the case *sub judice* properly considered the facts and circumstances surrounding the alleged part performance; as more fully set forth above, we, too, believe that the alleged part performance (i.e., the execution of the deed), standing on its own, failed to show that some contract existed between Jean and Joe.

3.

■ Jean further alleges that her part performance consisted of her seeking counsel from her husband's attorney *and* conveying her farms into a tenancy by the entirety (as opposed to just the latter). As more fully discussed above, we believe that the conveyance of land at issue is objectively explainable as that of a married person who, simply because she loves and has affection for her spouse, conveys the object property to herself and her spouse as tenants by the entirety. The fact that Jean sought out the assistance of her husband's attorney to prepare the relevant documents is of no consequence; that is, the assistance of counsel to draft a deed does not, either of itself or in combination with the subsequent execution of such a deed, necessarily and unequivocally demonstrate the existence of an underlying contract.

4.

█ Finally, Jean contends that the trial court erred by refusing to admit the testimony of the deed scrivener. We disagree.

As more fully discussed above, the testimony of the deed scrivener may have been admissible if such testimony established an *alternative grounds* on which the alleged part performance was objectively explainable. However, such testimony is absolutely inadmissible and irrelevant for the purpose it was presently sought to be admitted, i.e., to *justify or explain* the alleged part performance. As indicated above, the part performance itself must necessarily and unequivocally—apart from any explanatory testimony—refer to the existence of an agreement. Therefore, the trial court did not err in excluding the explanatory testimony of the deed scrivener.

B.

█ Jean has also asked us to consider, based upon the evidence presented, whether the trial court erred in finding that Joe and Jean were not partners in a family business. Specifically, Jean, in her brief before this court, contends that the trial court erred because it relied *only* on a tax schedule when it decided that there did not exist a family partnership between Jean and Joe. The rules that guide the court in determining whether or not a partnership exists are well-settled, and have been applied in many cases:

> The partnership test as to the existence of a partnership relation ... is that a partnership is formed and exists only when it is the intention of the parties that they should be partners. Partnership contracts, like other contracts, are governed by the intention of the parties.... This intent may be manifest by the terms of their agreement, the conduct of the parties to each other under it, or by the circumstances generally surrounding the transaction.

*Collier v. Collier,* 182 Md. 82, 88, 32 A.2d 469 (1943) (quoting *Southern Can Co. v. Sayler,* 152 Md. 303, 314, 136 A. 624 (1927)). Furthermore, the burden of proving a partnership is upon the party who asserts it. *See, e.g., Beard v. Beard,* 185 Md. 178, 185, 44 A.2d 469 (1945), and its progeny. With the burden of proof upon her, Jean has thus raised a question of fact, and as such we will not disturb the finding of the trial court unless it was clearly erroneous. Md.Rule 8–131(c).

■ Jean correctly contends that uncontroverted testimony showed that she and Joe both made management decisions for the business, and worked together without salary or other direct compensation. These facts, although relied on heavily by Jean, do not per se establish the existence of a partnership. *See, e.g., Collier,* 182 Md. at 88–89, 32 A.2d 469 (the services of a spouse, rendered while assisting the other spouse in the other spouse's business, does not per se establish a partnership).

■ Jean also contends that the parties held themselves out as partners, as evidenced by the neon "J & J" sign above the door to the business, and as further evidenced by the fact that the parties apparently referred to Newburg Super Truck Parts as a "family business." While perhaps relevant, there is nothing in Maryland law that suggests that such indicia prove, per se, the intent of the parties to establish a partnership.

Finally, Jean contends that the parties split the proceeds of the business entity, as would partners in a partnership.

On the other hand, it is clear that there was no written partnership agreement entered into between Jean and Joe. Furthermore, as a matter of record, Joe had already completed a significant amount of work toward creating the business before he even began dating Jean; that is, he had purchased the land, commenced construction on the large commercial structure which would subsequently house the business, and opened up a commercial bank account in his

name only (although he did subsequently add Jean's name to this commercial account).

In addition, the trial court did indeed consider the tax form as evidencing the intent of the parties to *not* form a partnership. While such a form is not conclusive of the parties' intent, it does evidence such intent. *See, e.g., Collier, supra; Beard, supra* (although in each case the court considered the parties' income tax form as relevant, the court indicated it wasn't bound by it).

Finally, the weight of the evidence strongly suggests that the $130,000 "put into" the business by Jean constituted a loan, for which she subsequently would desire repayment.

We cannot say with certainty that, had we been sitting as the finder of fact, and had this evidence subsequently come before us, we would necessarily have found—as did the trial court below—that Jean failed to prove the existence of a partnership by the preponderance of the evidence. Nevertheless, in reviewing the record before us, we cannot say that the trial court's determination was clearly erroneous.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.